PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-1420

FADWA SAFAR; JAN ESHOW,

Plaintiffs - Appellants,

v.

LISA TINGLE; STEPHANIE RODRIGUEZ,

Defendants - Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. T. S. Ellis, III, Senior District Judge. (1:15-cv-00467-TSE-TCB)

Argued: March 21, 2017                                    Decided: June 7, 2017

Before WILKINSON, DIAZ, and FLOYD, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge Diaz joined. Judge Floyd wrote a separate concurring opinion.

**ARGUED**: Victor M. Glasberg, VICTOR M. GLASBERG & ASSOCIATES, Alexandria, Virginia, for Appellants. Alexander Francuzenko, COOK CRAIG & FRANCUZENKO PLLC, Fairfax, Virginia; Julia Bougie Judkins, BANCROFT, MCGAVIN, HORVATH & JUDKINS, PC, Fairfax, Virginia, for Appellees. **ON BRIEF**: Maxwelle C. Sokol, VICTOR M. GLASBERG & ASSOCIATES, Alexandria, Virginia, for Appellants. Broderick C. Dunn, Philip C. Krone, COOK CRAIG & FRANCUZENKO PLLC, Fairfax, Virginia, for Appellee Lisa Tingle

WILKINSON, Circuit Judge:

Plaintiffs Jan Eshow and Fadwa Safar were arrested, and Safar briefly incarcerated, for an allegation of fraud that was mistakenly reported and almost immediately retracted. They brought suit under 42 U.S.C. § 1983 and state tort law against the police officer and prosecutor who, at different stages of the criminal process, learned that no crime had occurred and yet failed to take steps to withdraw an arrest warrant. For the reasons that follow, we affirm the grants of immunity to the police officer and prosecutor on the § 1983 claims. As to the state law claims, however, we remand with instructions to dismiss the claims without prejudice to plaintiffs' right to proceed in state court.

I.

This case is an appeal from a Rule 12(b)(6) dismissal, which requires us to "accept as true all of the factual allegations contained in the complaint." *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 388 (4th Cir. 2014). To survive a motion to dismiss, the complaint must state a "plausible claim for relief" that "permit[s] the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

What began as a simple exercise in bargain shopping took an unfortunate turn. Plaintiffs Eshow and Safar are married residents of Alexandria, Virginia. In September 2012, Eshow purchased around $1,000 of home flooring from Costco in Pentagon City, Virginia. Shortly thereafter, while browsing another Costco store, he saw that the same flooring was on sale. After learning that he could take advantage of the sale price at the

2

store of purchase, on October 17, 2012 Eshow returned to the Pentagon City Costco to get the discount. Store personnel explained that he should purchase the identical flooring at the current markdown and then immediately return it, using his initial sales receipt as the basis for the refund. Eshow followed these instructions and obtained a refund on the joint account he shared with Safar.

A few hours later, Costco called the Arlington County Police Department to report—mistakenly—that Eshow and Safar had fraudulently secured a refund on goods they never purchased. Officer Stephanie Rodriguez, along with another colleague, responded to the report and reviewed a video showing Eshow seeking the refund. Rodriguez filed an affidavit requesting arrest warrants for both plaintiffs, and a magistrate judge issued the warrants.

The next day, Costco representatives contacted Rodriguez and notified her that the allegations against Eshow and Safar were unfounded—no fraud had in fact occurred. Rodriguez did not take any steps to correct her affidavit or withdraw the arrest warrants.

Eight months went by without incident until Eshow was pulled over for speeding in Fairfax County, Virginia. Based on the outstanding arrest warrant, the police officers handcuffed Eshow in front of his family and placed him under arrest. On July 31, 2013, Eshow appeared before the Arlington County General District Court to contest the fraud charge. At the hearing, a Costco representative explained to Rodriguez and Lisa Tingle, the assistant commonwealth's attorney, that the charge was erroneous and should be dropped. Tingle moved for *nolle prosequi* and the court dismissed the case against Eshow.

Both Rodriguez's investigative notes and Tingle's case file indicated that identical charges were pending against Safar, but neither took any action to withdraw her arrest warrant. Rodriguez and Tingle had previously been trained in the standard procedures for withdrawing warrants from statewide law enforcement databases. In particular, "an attorney for the Commonwealth may at any time move for the dismissal and destruction of any unexecuted warrant or summons issued by a magistrate." VA. CODE ANN. § 19.2-76.1 (West 2011).

In late 2013, Eshow and Safar applied for American citizenship. After passing her citizenship test, Safar turned to the next requirement and sought clearance letters from local police in counties where she previously resided. On December 23, 2013, Safar reported to the police headquarters in Prince George's County, Maryland to get a clearance letter. Upon reviewing her file, an officer informed her that she was under arrest pursuant to an active warrant. Safar was incarcerated in Maryland, and a magistrate advised her that a transfer to Arlington, Virginia could not be arranged until the county judges returned from the holiday.

As part of the incarceration process, Safar was strip searched and inspected for smuggled contraband. She was the primary caregiver for three young children at the time and was denied the opportunity to use a breast pump. Safar remained in jail for three days until December 26, 2013, when she was transferred to Arlington, Virginia and released. The following day the case against her was dismissed *nolle prosequi* by a different assistant commonwealth's attorney.

Plaintiffs filed a complaint against Rodriguez and Tingle in federal district court. Eshow and Safar asserted claims of unconstitutional arrest under § 1983. They also alleged, according to Virginia tort law, that the failure to withdraw Safar's arrest warrant was grossly negligent.

Rodriguez and Tingle moved to dismiss all claims, and on April 4, 2016 the district court granted their motions. First, the district court rejected plaintiffs' § 1983 claims against Rodriguez. Neither the Fourth Amendment nor the Due Process Clause provided a basis for relief, the court reasoned, and Rodriguez was entitled to qualified immunity in any event. Turning to the § 1983 claim against Tingle, the court found that she was shielded by absolute prosecutorial immunity. Finally, the court held that plaintiffs failed to state a claim for gross negligence under Virginia law. This appeal followed.

## II.

The bulk of plaintiffs' complaint alleges claims under § 1983. Section 1983, of course, is not an independent source of substantive rights, but simply a vehicle for vindicating preexisting constitutional and statutory rights. *See Graham v. Connor*, 490 U.S. 386, 393–94 (1989). The first step in any such claim is to pinpoint the specific right that has been infringed. *See Baker v. McCollan*, 443 U.S. 137, 140 (1979).

Plaintiffs contend that Rodriguez's and Tingle's failure to withdraw the arrest warrants after learning that the charges were erroneous constituted an unconstitutional arrest. They assert that the alleged omissions breach two constitutional guarantees: the Fourth Amendment and the Fourteenth Amendment's Due Process Clause.

5

As an initial matter, we are mindful of the Supreme Court's injunction that the Due Process Clause is not the proper lens through which to evaluate law enforcement's pretrial missteps. Compared to the "more generalized notion" of due process, the Fourth Amendment "provides an explicit textual source of constitutional protection against [unreasonable seizures and arrests]," *Graham*, 490 U.S. at 395, and "define[s] the 'process that is due' for seizures of persons or property in criminal cases," *Gerstein v. Pugh*, 420 U.S. 103, 125 n.27 (1975). Consequently, a police officer who withholds exculpatory information does not violate the Fourteenth Amendment unless the officer's failure to disclose deprived the plaintiff of the "right to a fair trial." *Taylor v. Waters*, 81 F.3d 429, 436 n.5 (4th Cir. 1996). Further, insofar as plaintiffs' claims sound in generic negligence, the Due Process Clause "is simply not implicated" by acts of official carelessness. *Daniels v. Williams*, 474 U.S. 327, 328 (1986). The Fourth Amendment, then, is the only actionable ground for relief.

Having identified the constitutional right at issue, we now turn to the precise scope of the Fourth Amendment guarantee and defendants' respective claims for immunity.

A.

Rodriguez contends that any cognizable Fourth Amendment claim against her is barred by the doctrine of qualified immunity. Qualified immunity "takes cognizance of human imperfections," *West v. Murphy*, 771 F.3d 209, 213 (4th Cir. 2014), and protects government officials from liability for "bad guesses in gray areas," *Braun v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). The doctrine strikes a balance between two key societal

6

interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Determining whether qualified immunity applies therefore presents a two-pronged inquiry: "whether the facts . . . make out a violation of a constitutional right" and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 232. We may address either prong of the analysis first. *See id.* at 236.

The animating principle here is one of fair notice. Because police officers, like private citizens, have a right to fair warning, the defense "operates to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 740 (2002). Courts thus inquire whether the "contours of" a plaintiff's asserted right were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). And it is a "longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (quoting *Ashcroft*, 563 U.S. at 742). Rather, the "clearly established law must be 'particularized' to the facts of the case" so as to avoid transforming qualified immunity into "a rule of virtually unqualified liability." *Id.* (quoting *Anderson*, 483 U.S. at 639–40). Before concluding that an officer has breached a clearly established right,

7

then, we must "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Id.*

In Rodriguez's case, such legal notice was lacking. For starters, this suit does not cleanly fall within an established category of Fourth Amendment claims. The claim does not challenge an officer's action, which is standard Fourth Amendment fare, but a failure to act which is much more open-ended. *Cf. DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–96 (1989) (declining to impose on officials an affirmative duty to prevent harm and thus convert the Constitution into a sword rather than a shield against government interference). Plaintiffs cannot state a false arrest claim, since Rodriguez took no part in the actual seizure and the arresting officers acted pursuant to a facially valid warrant. *See Porterfield v. Lott*, 156 F.3d 563, 568 (4th Cir. 1998) ("[A] claim for false arrest may be considered only when no arrest warrant has been obtained."). Nor do plaintiffs make out a failure to investigate claim, which tests an officer's effort to establish probable cause *before* seeking a warrant. *See Wadkins v. Arnold*, 214 F.3d 535, 541 (4th Cir. 2000).

Here the complaint presupposes an altogether novel duty: *after* a magistrate issued the arrest warrants based on probable cause, Rodriguez had the duty to take steps to withdraw the warrants upon learning that the charges were meritless. By no means do we diminish the dreadful ordeal that Rodriguez might have averted by seeking to retract the warrants. But that is a different matter from holding that Rodriguez had an affirmative duty in law to do so. We need not decide whether such a duty exists: the critical point is that the proposed duty was certainly not clearly established.

Tellingly, plaintiffs fail to note what exactly the duty was or where in the law the obligation was to be found. They do not sketch out the procedures officer Rodriguez was supposed to follow, identify the point in the criminal process when such steps should have been taken, or explain why it was her responsibility to have the warrants revoked. Moreover, a Virginia police officer does not "ha[ve] the authority to unilaterally withdraw or dismiss a lawfully issued arrest warrant." 2003 Op. Va. Att'y Gen. No. 03-025, 2003 WL 21403098 (Va. A.G.). Only an attorney for the Commonwealth may move the court for dismissal. *See* VA. CODE ANN. § 19.2-76.1. And while Rodriguez might have raised the issue with a supervisor or relayed her concerns to a prosecutor, we are unaware of a nebulous duty requiring police officers to follow some undefined procedure whenever they come across further information that casts doubt on an active arrest warrant. After all, "in a situation in which a warrant has issued upon probable cause, a police officer is not called upon either to exercise discretion or to weigh the proof." *Brady v. Dill*, 187 F.3d 104, 112 (1st Cir. 1999); *see also id.* at 111 ("[I]t is the magistrate and not the policeman who should decide whether probable cause has dissipated to such an extent following arrest that the suspect should be released.").

This is no abstract point. Although plaintiffs assure us that this is an exceptional circumstance where probable cause had completely dissipated, we must be careful not to make bad law out of an ostensibly "easy" case. "[T]he intuitively sensed obviousness of a case induces a rush to judgment, in which a convenient rationale is too readily embraced without full consideration of its . . . future ramifications." *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 804 (1980) (Blackmun, J., concurring in the judgment). To

9

say that an affirmative duty attached here fails to emphasize the limits of such an obligation and how it might function in practice. Probable cause is fluid; after an arrest warrant is sworn out there often comes to light additional evidence that may be more or less exculpatory. Sometimes a victim may recant, as Costco did here. Or perhaps a complaining witness offers new or conflicting testimony. In either case, an officer is forced to make a discretionary call about whether the subsequent information undermines a magistrate's finding of probable cause and, if so, how best to proceed.

Given the vagaries of these evidentiary judgments, courts should not lightly enter the business of micromanaging police investigations and impose a categorical duty on officers governing the termination of allegedly stale arrest warrants. Indeed, if every failure of a police officer to act in some unspecified way on the basis of new information gave rise to liability, we would invite a legion of cases urging us to second-guess an officer's decision about whether to second-guess a magistrate's finding of probable cause.

In any event, to the extent that plaintiffs struggle to define a Fourth Amendment right, they face an even bigger obstacle demonstrating that such a duty was clearly established. Plaintiffs frame the constitutional right at the highest level of generality, asserting that centuries of "Anglo-American law" forbid a state official from "knowingly caus[ing] or permit[ting] the arrest of an innocent citizen." App. Br. at 9. That is certainly true, as far as it goes. But what plaintiffs fail to do is "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White*, 137 S. Ct. at 552.

10

The absence of controlling cases suggests that Rodriguez did not have a clearly established affirmative duty to take steps to revoke the arrests warrants. In fact, all the indications from our case law point to the opposite conclusion. In *Taylor v. Waters*, 81 F.3d 429 (4th Cir. 1996), for instance, we held that a police investigator did not violate the Fourth Amendment when he declined to terminate post-arrest proceedings after hearing from the plaintiff's roommate that the plaintiff was not involved in the alleged drug offense. *See id.* at 433. Once a neutral magistrate finds probable cause and issues an arrest warrant, we reasoned, "the Fourth Amendment does not impose any further requirement of judicial oversight or reasonable investigation to render pretrial seizure reasonable." *Id.* at 436. Accordingly, an officer's failure to act upon allegedly exculpatory evidence "does not render the continuing pretrial seizure of a criminal suspect unreasonable under the Fourth Amendment." *Id.* at 437.

So too in *Brooks v. City of Winston-Salem*, 85 F.3d 178 (4th Cir. 1996), we rejected a similar Fourth Amendment claim alleging that an arresting officer did not attempt to halt the criminal proceedings after learning that the plaintiff had not committed the suspected offenses. *See id.* at 184–85. Once again, we took notice of the initial process provided by a neutral magistrate and in the continuing ability of judicial proceedings to test the strength of a case against those detained. Thus, when "a pretrial seizure has been rendered reasonable by virtue of a probable cause determination," any "continuing pretrial seizure of a criminal defendant . . . is [also] reasonable." *Id.* at 184. Any other rule would subject those in law enforcement to the prospect of suits for an endless variety of supposed pretrial failures or omissions.

11

We do not require that a prior case be identical to the case at bar to advance a civil suit. *See Ashcroft*, 563 U.S. at 741. But despite their assertions to the contrary, plaintiffs cannot marshal a "settled Fourth Amendment principle" that would have put Rodriguez on notice that she was violating the Constitution. *See White*, 137 S. Ct. at 552. Given the absence of an established duty to act, we award qualified immunity to Rodriguez on the § 1983 claims.

B.

Tingle asserts for her part that she is entitled to absolute prosecutorial immunity. It is well settled that prosecutorial activities that are "intimately associated with the judicial phase of the criminal process" are absolutely immune from civil suit. *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). Recognizing that "harassment by unfounded litigation" could "cause a deflection of the prosecutor's energies from his public duties" and lead the prosecutor to "shade his decisions instead of exercising the [appropriate] independence of judgment," the Supreme Court in *Imbler* determined that the protection afforded by qualified immunity was inadequate. *Id.* at 423. A prosecutor, the Court explained, inevitably makes many on-the-spot judgments that "could engender colorable claims." *Id.* at 425. In light of the "substantial danger of liability even to the honest prosecutor" that such suits pose when they survive the pleadings, the immunity that a prosecutor enjoys is absolute. *Id.*

At the same time, the *Imbler* Court was careful to note that absolute immunity may not attach when a prosecutor is acting as an "administrator and investigative officer" rather than as "an officer of the court." *Id.* at 430–31 & n.33. Although the Court had

12

little difficulty concluding that "initiating a prosecution and . . . presenting the State's case" are prosecutorial activities, *id.* at 431, it acknowledged that "[d]rawing a proper line between these functions may present difficult questions," *id.* at 431 n.33. Going forward, courts should apply a "functional" analysis that considers whether the "reasons for absolute immunity apply with full force" to the conduct at issue. *Id.* at 430.

In the decades following *Imbler*, the Supreme Court began to plot the point at which a prosecutor begins to function as an advocate in judicial proceedings. The line between the investigative and advocacy phase typically turns on the difference between the "detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested" and the "advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Accordingly, the Supreme Court has held that a prosecutor is not entitled to absolute immunity when providing advice to police during a criminal investigation, *see Burns v. Reed*, 500 U.S. 478, 496 (1991), or when "acting as a complaining witness rather than a lawyer" in support of a warrant application, *see Kalina v. Fletcher*, 522 U.S. 118, 129, 132 (1997). But when a prosecutor appears in court to present evidence in support of a search warrant, *Burns*, 500 U.S. at 492, or decides to seek an arrest warrant based on an evaluation of probable cause, *see Kalina*, 522 U.S. at 129, absolute immunity kicks in.

The Supreme Court again considered the boundary between administrative and advocacy activities in *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009), holding that a prosecutor performing an ostensibly "administrative" task still enjoys absolute immunity

13

if the act is done in service of an advocacy function. *See id.* at 349. The Court drew a distinction based on the activity's proximity to the conduct of a trial: certain kinds of administrative obligations are "directly connected with the prosecutor's basic trial advocacy duties," *id.* at 346, and "require legal knowledge and the exercise of related discretion," *id.* at 344, whereas others such as "workplace hiring, payroll administration, [and] the maintenance of physical facilities" are more tangentially related (if at all) to a trial, *id.* As such, a district attorney and his chief assistant were absolutely immune from liability related to training staff prosecutors on impeachment material and managing a trial-related information system. *See id.* at 349.

A prosecutor's decision to seek an arrest warrant is protected by absolute immunity, *see Kalina*, 522 U.S. at 129, but it remains an open question whether a prosecutor receives absolute immunity when she fails to withdraw an arrest warrant after learning that no crime had been committed. Because a prosecutor's decision whether to withdraw an arrest warrant is "intimately associated with the judicial phase of the criminal process," *Imbler*, 424 U.S. at 430, we conclude that Tingle is entitled to absolute immunity.

Plaintiffs contend that retracting a stale warrant is merely a ministerial duty and thus cannot be protected by absolute immunity. This argument misses the mark. To the extent a decision to revoke an arrest warrant can be cast as administrative, it is "directly connected with the prosecutor's basic trial advocacy duties," *Van de Kamp*, 555 U.S. at 346, and "require[s] legal knowledge and the exercise of related discretion," *id.* at 344. Under Virginia law, a prosecutor does not have unilateral authority to withdraw an arrest

14

warrant and must first file a motion to dismiss with the appropriate court. *See* VA. CODE ANN. § 19.2-76.1. Filing and arguing motions in court is garden-variety trial work that falls comfortably within a prosecutor's core advocacy duties. *See Dababnah v. Keller-Burnside*, 208 F.3d 467, 471 (4th Cir. 2000) ("Failure to grant a prosecutor immunity for actions taken in open court in pursuit of a court order would be a portentous step."). The decision to file a motion to rescind, moreover, generally involves the exercise of substantial discretion. A prosecutor is not bound to withdraw a warrant every time a victim purports to recant or conflicting information comes to light. Rather, prosecutors engage in the familiar task of "evaluating evidence" and determining whether to retain the warrant based on a revised assessment of probable cause. *Buckley*, 509 U.S. at 273. Consequently, we find that the choice to move the court for withdrawal is an extension of the prosecutor's fundamental judgment of "whether and when to prosecute." *Imbler*, 424 U.S. at 431 n.33; *see also Kalina*, 522 U.S. at 129–30.

Moreover, deciding whether or not to withdraw an arrest warrant is one of those advocacy functions "to which the reasons for absolute immunity apply with full force." *Imbler*, 424 U.S. at 430. If absolute immunity does not insulate prosecutors for their refusal to withdraw an arrest warrant, it would work an end run around *Kalina* and give rise to an anomalous regime where criminal defendants could mount civil suits against prosecutors for the maintenance of arrest warrants even though those same defendants could not challenge the initial decision to seek a warrant. Given the frequency with which prosecutors come across new information after a warrant is sworn out, we are hesitant to

open the door to all manner of collateral attacks on what at bottom is a prosecutor's appraisal of probable cause.

We recognize, of course, that Safar's case, at least as alleged in the complaint, presents a stark scenario where the charges have been wholly discredited. But absolute immunity "does not exist to help prosecutors in the easy case; it exists because the easy cases bring difficult cases in their wake." *Van de Kamp*, 555 U.S. at 349. In the mine run of cases, which generally turn on thorny factual questions, prosecutors should not be subject to "the constant dread of retaliation" for the maintenance of arrest warrants. *Imbler*, 424 U.S. at 428. As the Supreme Court recognized in *Imbler*, allowing such suits to proceed would trammel an advocate's "independence of judgment," *id.* at 423, and might "pose substantial danger of liability even to the honest prosecutor," *id.* at 425.

There are also existing safeguards that deter egregious prosecutorial misconduct in this arena. Prosecutors remain subject to criminal sanction for willful acts of abuse. *Id.* at 429. And "[t]he organized bar's development and enforcement of professional standards for prosecutors" provides a "well-developed and pervasive mechanism" for controlling official malpractice. *Malley v. Briggs*, 475 U.S. 335, 343 n.5 (1986); *accord Imbler,* 424 U.S. at 429 ("[A] prosecutor stands perhaps unique, among officials whose acts could deprive persons of constitutional rights, in his amenability to professional discipline by an association of his peers."). Protections such as these "obviate the need for damages actions to prevent unjust results." *Mitchell v. Forsyth*, 472 U.S. 511, 522–23 (1985).

We acknowledge that granting absolute immunity leaves Safar, who was "genuinely wronged" by Tingle's oversight, "without civil redress" under § 1983. *Imbler*,

16

424 U.S. at 427. Yet the overall value of prosecutorial discretion may require that we accept the possibility that such discretion might be abused in the occasional case. As Justice Powell observed, the alternative of qualifying a prosecutor's immunity "would disserve the broader public interest" by "prevent[ing] the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system." *Id.* at 427–28.

## III.

Although the federal side of this case has come to a close, the fact that immunity may preclude a federal suit does not mean all avenues of redress are unavailable. Section 1983, for one, is not a "font" of state tort law that subjects every malfunction to correction by the federal judiciary. *See Paul v. Davis*, 424 U.S. 693, 701 (1976); *Baker*, 443 U.S. at 146 ("Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law."). "Our Constitution deals with the large concerns of the governors and the governed." *Daniels*, 474 U.S. at 332. It does not "purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Id.*

Our federal system instead contemplates a scheme of shared responsibility whereby state governments retain authority over conventional tort remedies. Compared to the blunter instrument of constitutional law, states are better positioned to experiment and fashion duties and remedies—whether through the legislature, courts, or private bar—that address local needs as they arise. Such questions are fundamentally one of resource allocation, which "involve a host of policy choices that must be made by locally elected

17

representatives, rather than by federal judges interpreting the basic charter of Government for the entire country." *Collins v. City of Harker Heights*, 503 U.S. 115, 129 (1992).

Which brings us to plaintiffs' remaining gross negligence claims. With respect to the state tort claim against Tingle, the district court held that she was protected by absolute immunity under *Imbler*. Likewise, the court dismissed the claim against Rodriguez because it concluded that Virginia does not recognize a cause of action based on negligent investigations or prosecution. *See Safar v. Tingle*, 178 F. Supp. 3d 338 (E.D. Va. 2016).

It may be that Virginia does not recognize a claim for gross negligence. But given the dearth of state law on negligent investigations, we think the definition of legal duties under the law of tort is best left for the state courts to resolve. Accordingly, because all federal claims have been found wanting, we instruct the district court on remand to dismiss the state law claims without prejudice to plaintiffs' right to advance their case in state court. *See Taylor*, 81 F.3d at 437 (declining to exercise supplemental jurisdiction over remaining state law claims and dismissing without prejudice); *see also Fox v. Custis*, 712 F.2d 84, 89 n.4 (4th Cir. 1983). Whether plaintiffs' allegations will ultimately prove to be correct we cannot tell. At this stage, however, the truth of their pleadings must be assumed, and the horrific sequence of events they have alleged makes us reluctant to foreclose any prospect of relief.

The district court correctly held that plaintiffs' § 1983 claims were barred by qualified or absolute immunity. We think, however, that the better course in this particular instance is to allow plaintiffs the opportunity to press their state tort claims in

18

state court. We thus affirm in part, reverse in part, and remand so that the dismissal of the state claims shall be without prejudice.

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*

FLOYD, Circuit Judge, concurring:

I agree with the majority's ultimate resolution of this case on qualified immunity grounds. However, because this case raises concerns for me regarding this Court's Fourth Amendment case law, and because I question the manner in which the majority disposes of the state law claims, I find it necessary to write separately.

I.

The majority rightly concludes that there is no clearly established law which Officer Stephanie Rodriguez could be said to have violated. Thus, she is entitled to qualified immunity under our familiar two-step sequence where we determine (1) whether there has been a violation of a constitutional right, and (2) whether that right was "clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The majority reaches this conclusion by taking the analysis out of order—which courts are permitted to do[1]—and does not ultimately decide whether there has been a violation of a constitutional right.

---

[1] In the same case permitting courts to take the qualified immunity analysis out of order, the Supreme Court also recognized that it is "often appropriate" and "often beneficial" to conduct the inquiry in order. *Pearson*, 555 U.S. at 236. This is so because "the two-step procedure promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Id.* Thus, as the Court has acknowledged, failure to define the contours of the constitutional duty at the first step of the qualified immunity analysis leaves the law undeveloped, leaves officers without notice of how they are expected to perform their duties in compliance with the Constitution, and leaves future plaintiffs without recourse due to the absence of any clearly established law.

20

Although I agree with the majority's conclusion, its analysis reveals aspects of this Circuit's Fourth Amendment case law that cause me great concern. As is familiar and oft-repeated by the Supreme Court, "the Fourth Amendment's ultimate touchstone is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citations omitted). The seizures that occurred when Plaintiffs Jan Eshow and Fadwa Safar were arrested strike me as manifestly unreasonable. The affiant for their warrants, Officer Rodriguez, was aware that probable cause for their arrests had *entirely* dissipated.[2] Yet, she did nothing to initiate any recall of the arrest warrants or to inform the Commonwealth's Attorney's Office that the information on which she relied to obtain the warrants was entirely undermined. I believe that the Fourth Amendment mandates that when probable cause for an outstanding arrest warrant wholly disappears and the affiant is aware, the affiant has a duty to take steps to rescind the warrant.

My belief that a seizure pursuant to a warrant for which probable cause has entirely dissipated is unreasonable under the Fourth Amendment is not novel. Multiple

---

[2] Probable cause in this case was formed when Officer Rodriguez responded to a call from Costco at approximately 9:15pm on October 17, 2012. J.A. 65. Upon arrival, she spoke exclusively with the Costco store manager, listened to his description of the incident, and watched video footage provided by him. *Id.* The only outside investigative work Officer Rodriguez conducted was to confirm the identities of Plaintiffs through their Costco membership and through Maryland DMV records. *Id.* Relying on this evidence, at 11:18pm and 11:21pm—approximately two hours after first responding to Costco—Officer Rodriguez provided sworn testimony to a magistrate in Arlington County to obtain two felony arrest warrants for Plaintiffs. J.A. 66–69. Then, at some point the next day, October 18, 2012, a representative from Costco contacted Officer Rodriguez to inform her that the allegations were mistaken and that no fraud had actually occurred. Thus, because Costco's complaint was the sole source of probable cause, the retraction of this complaint caused all probable cause to dissipate.

21

justices of the Supreme Court have recognized this point, albeit in opinions that have no binding force of law, as have several of our sister circuits.

In *United States v. Watson*, 423 U.S. 411, 414–24 (1976), the Supreme Court addressed the constitutionality of a statute authorizing a warrantless arrest even in the absence of exigent circumstances. In a concurring opinion, Justice Powell acknowledged that permitting only warrant-based arrests and warrantless arrests limited to exigent circumstances would be problematic. *Id.* at 431 (Powell, J., concurring). He explained that officers attempting to meet such a standard who "procur[ed] a warrant as soon as they had probable cause and then merely held it during their subsequent investigation . . . would risk a *court decision that the warrant had grown stale* by the time it was used." *Id.* (emphasis added). Justice Powell further noted that "in some cases the original grounds supporting the warrant could be disproved by subsequent investigation" which would cause the warrant to "be stale because [it was] *based upon discredited information*." *Id.* at 431 n.5 (emphasis added).

Justice Marshall, joined by Justice Brennan in dissent, also recognized this problem, stating that "probable cause to arrest, once formed, will continue to exist for the indefinite future, *at least if no intervening exculpatory facts come to light*." *Id.* at 449 (Marshall, J., dissenting) (emphasis added). Although Justice Marshall noted that "it is virtually impossible for probable cause to become stale between procurement [of a warrant] and arrest," *id.* at 451, he explained that "it should be obvious that when the probable cause supporting a warrant no longer exists, the warrant is void and the suspect cannot be arrested," *id.* at 452 n.18.

22

Other Supreme Court Justices have also recognized the possibility of an arrest warrant becoming stale due to exculpatory evidence coming to light before the execution of the warrant. *See Payton v. New York*, 445 U.S. 573, 619 (White J., dissenting, joined by Burger, C.J., and Rehnquist, J.).

Our sister circuits, in both published and unpublished opinions, have also recognized this possibility. *See United States v. Bizier*, 111 F.3d 214, 219–20 (1st Cir. 1997) (noting that "probable cause would grow stale only if it emerges that it was based on since discredited information," but reasoning that the opposite happened in the case at bar (citing *Watson*, 423 U.S. at 432 n.5 (Powell, J., concurring))); *Russell v. Devereaux*, 389 F. App'x 557, 560 (7th Cir. 2010) (noting that "probable cause to make an arrest grows 'stale only if it emerges that it was based on since discredited information'" in rejecting a claim that probable cause was stale because nearly a year had passed between investigation and arrest (quoting *Bizier*, 111 F.3d at 219)); *United States v. Henderson*, 613 F.3d 1177, 1181 (8th Cir. 2010) (noting similarly, but finding no intervening exculpatory act); *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005) ("If probable cause is established at any early stage of the investigation, it may be dissipated if the investigating officer later learns additional information that decreases the likelihood that the defendant has engaged, or is engaging, in criminal activity. A person may not be arrested, or must be released from arrest, if previously established probable cause has dissipated."); *United States v. Edwards*, 632 F.3d 633, 640 (10th Cir. 2001) (holding that "[i]f the police learn information that destroys their probable cause to arrest a defendant, the arrest may become illegal," but finding police had sufficient evidence to

23

believe an offense had occurred.).  The Tenth Circuit has recently reaffirmed its belief in this position.  *See United States v. Lopez*, 849 F.3d 921, 929 (10th Cir. 2017) (relying on *Edwards* to find that an officer could not detain a driver for driving without a license once informed by the dispatcher that the driver had a valid license where the statute prohibited conviction if the driver is able to present the valid license in court).

The duty I envision would be limited to those extreme cases where probable cause has *completely* dissipated, a question we ask police officers to evaluate every day in the context of warrantless arrests.  *Cf. Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016) ("Whether probable cause exists in a particular situation always turns on two factors in combination:  the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." (internal quotation marks and alterations omitted)).  Thus, it would not be a departure to require an officer, having sworn under oath to facts in support of a warrant application, to have a responsibility to inform the court when the facts have so drastically changed as to eliminate all probable cause prior to the execution of the warrant the officer sought.[3]

---

[3] To the extent concerns arise about the implications of this duty in the context of exclusion of evidence in a criminal case, the existence of a Fourth Amendment violation does not necessarily mean that evidence is excluded, as the good faith exception to the exclusionary rule often provides safe harbor.  *See, e.g.*, *Herring v. United States*, 555 U.S. 135, 140–47 (2009) (accepting the parties' agreement that the Fourth Amendment was violated when the defendant was arrested pursuant to a warrant incorrectly listed as active in a computer database, but ultimately finding that the exclusionary rule did not bar any evidence obtained incident to the search due to the arresting officer's good faith belief that the warrant was valid).

Although I believe that the Fourth Amendment mandates such a duty, I recognize that announcing such a duty in this case would stand in tension with our decisions in *Taylor v. Waters*, 81 F.3d 429 (4th Cir. 1996) and *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178 (4th Cir. 1996), as the majority notes. *See ante* at 11.[4] I fear that the holdings in these cases are overbroad, and ultimately stray too far from their facts in appearing to establish a bright line rule that all potential liability for an officer cuts off at the moment of a warrant being issued, absent a materially false statement or material omission in the warrant application. *See Miller v. Prince George's Cty., Md.*, 475 F.3d 621, 627–28 (4th Cir. 2007) (holding that an officer cannot intentionally or with reckless disregard for the truth make materially false statements or omit material facts from an arrest warrant affidavit).

If we adhere to the idea of reasonableness in understanding the Fourth Amendment, as we must, then the holdings of *Taylor* and *Brooks* appear to be in tension with that idea. Thus, I write separately to note this problem in the hopes that a future en banc court may have the chance to consider the impact of *Taylor* and *Brooks* and considerably narrow the scope of their holdings.

---

[4] Officer Rodriguez also points to the fact that an officer has no duty to investigate every exculpatory lead before establishing probable cause. *See, e.g.*, *Torchinsky v. Siwinski*, 942 F.2d 257, 264 (4th Cir. 1991). This is both unremarkable and inapposite. Neither I nor the Plaintiffs suggest that Officer Rodriguez was required to undertake a more searching investigation before seeking the warrants, or even continue investigating after the warrants were obtained. But I do not believe Officer Rodriguez could then ignore information that entirely negated probable cause after the warrant was obtained on the basis that she had no duty to investigate.

25

## II.

Next, I agree with my colleagues in the majority that the district court was incorrect to adjudicate Plaintiff's state law gross negligence claims on the grounds that Virginia state law recognizes no duty for negligent investigation.[5] However, I write separately to note two issues: (1) the federal cases relied upon by the district court regarding the existence of a duty under Virginia state law include no citations to Virginia state law, and should be viewed by future courts with great skepticism; and (2) the manner in which this Court is disposing of this issue requires clarification.

## A.

The district court relied on a series of three cases to support the proposition that "Virginia does not recognize a cause of action for the negligent investigation or incorrect initiation of criminal process." *Safar v. Tingle*, 178 F. Supp. 3d 338, 352 (E.D. Va. 2016); *see id.* at 352 & n.13 (citing *Boyce v. Bennett*, No. 14-cv-249, 2015 WL 6873547, at *8 (E.D. Va. Nov. 9, 2015); *Durham v. Horner*, 759 F. Supp. 2d 810, 815 (W.D. Va. 2010); *Lewis v. McDorman*, 820 F. Supp. 1001, 1008 (W.D. Va. 1992), *aff'd on other grounds* 28 F.3d 1210 (4th Cir. 1994) (unreported table decision)). The problem is that not one of these cases cites to any Virginia state law.

---

[5] In doing so, I understand that we are vacating the portion of the district court's decision finding that the prosecutor was protected by absolute immunity on the state claims. It is worth noting that the Supreme Court of Virginia has expressly disavowed *Imbler v. Pachtman*, 424 U.S. 409 (1976), and its progeny for defining the contours of prosecutorial immunity under Virginia state law. *Andrews v. Ring*, 585 S.E.2d 780, 785 (Va. 2003). I do not understand the district court's holdings on state law to be binding on the parties should they choose to litigate the matter in the future in state court.

In the oldest of these three cases, *Lewis*, in dismissing a claim against a detective for willful and wanton negligence, the court stated—without citation—that there is no "duty upon police officers to exercise reasonable care in conducting investigations or in playing a role in prosecutions." *Lewis*, 820 F. Supp. at 1008. The court faulted the plaintiff for failing to cite any cases in support, but went on to explain that it was the court's view that "no such duty exists and that Virginia simply has never recognized a cause of action based on negligent investigations or prosecution." *Id.* Relying exclusively on *Lewis*, the court in *Durham* similarly held that "Virginia law recognizes no such cause of action against police officers for conducting investigations." *Durham*, 759 F. Supp. 2d at 815 (citing *Lewis*, 820 F. Supp. at 1008). Finally, the court in *Boyce* relied solely on *Lewis* and *Durham* for the proposition that there was no "viable state-law 'gross negligence' cause of action against a city police officer for negligent investigation and/or negligent production of investigative materials." *Boyce*, 2015 WL 6873547, at *7 (citing *Durham*, 759 F. Supp. 2d at 815; *Lewis*, 820 F. Supp. 2d at 1008) (emphasis omitted).[6]

---

[6] The court in *Boyce* also addressed the fact that Virginia appears to disfavor malicious prosecution claims arising from criminal proceedings, which it found "suggests a reason why Virginia courts may treat investigative tort actions against police officers differently." *Id.* at *8 n.11 (citing *Ayyildiz v. Kidd*, 266 S.E.2d 108, 110 (Va. 1980)). However, it is worth noting that an earlier ruling in *Boyce* relied on cases *other* than *Lewis* and *Durham* to find that "no Virginia court has explicitly held" that a duty to conduct a competent investigation exists. *See Boyce v. Bennett*, No. 13-cv-249, 2014 WL 12561596, at *5–6 (E.D. Va. Nov. 3, 2014) (finding that state and federal cases on which plaintiff attempted to rely were all resolved without addressing the existence of a duty, and thus were inapposite as they failed to "explicitly" hold that a duty existed).

27

It is true that no Virginia case cited by the parties on this appeal encompasses this factual scenario. But it is equally true that no Virginia case stands for the proposition that no such cause of action exists. A federal court sitting in diversity or hearing pendent state law claims pursuant to 28 U.S.C. § 1367 must "apply the governing state law, or, if necessary, predict how the state's highest court would rule on an unsettled issue." *Horace Mann Ins. Co. v. Gen. Star Nat'l Ins. Co.*, 514 F.3d 327, 329 (4th Cir. 2008) (citation omitted); *see also S. Atl. Ltd. P'ship of Tenn., L.P. v. Riese*, 284 F.3d 518, 530 n.15 (4th Cir. 2002) ("With respect to the various supplemental state law claims, we apply the substantive law of the state under which the claims were filed . . . ." (citation omitted)).

Without an underlying citation to Virginia state court decisions, treatises, or any other authority, this daisy chain of citations of district court cases that relies on no citations to Virginia state law cannot reasonably be understood to accurately depict the state of Virginia law. Indeed, a different district court case has permitted a gross negligence claim for negligently conducting an investigation to survive past summary judgment, albeit without expressly finding that a duty to properly conduct an investigation exists. *Savage v. Cty. of Stafford, Va.*, 754 F. Supp. 2d 809, 817 (E.D. Va. 2010), *aff'd on other issues*, 488 F. App'x 766 (4th Cir. 2012) (per curiam). In fact, the claim was tried, given to the jury to decide, and the jury then found in favor of the police officer defendant. *See* Jury Verdict at 2, *Savage v. Cty. of Stafford, Va.*, No. 09-cv-1328 (E.D. Va. Apr. 20, 2011), ECF No. 211. As such, I doubt the veracity of the claim made in *Lewis*, *Durham*, and *Boyce*, and have grave doubts about the continued viability of

28

citing to this trio of cases for the proposition that no claim for gross negligence in conducting an investigation can exist. Instead, I find this state law question unanswered by Virginia authority.

B.

Turning next to how we have resolved this issue, in the absence of guidance from the state courts, we would ordinarily certify an unsettled question of law to the state's highest court if the state so permits. *See, e.g.*, *C.F. Trust, Inc. v. First Flight Ltd. P'ship*, 306 F.3d 126, 141 (4th Cir. 2002) (certifying two questions to the Supreme Court of Virginia in the absence of sufficient information to determine whether Virginia law would permit reverse veil-piercing against a limited partnership). The Court has not done that today, instead remanding the case to the district court with instructions to dismiss the state law claims without prejudice so Plaintiffs may pursue their state law claims in state court. However, the Court has not clearly identified the basis for this action.

We have, in a case where the defendant removed a case originally filed in state court to federal court, vacated the district court's judgment on the state law claims and remanded with instructions for the district court to remand the state law claims to the state court where "[t]he questions presented . . . are relatively novel, complex and of great local importance." *Fox v. Custis*, 712 F.2d 84, 89–90 (4th Cir. 1983) (cited by the majority, *ante* at 18). And indeed, we have recognized that in declining supplemental jurisdiction under 28 U.S.C. § 1367(c), "a court may dismiss the claim or, if it was

29

removed, remand it to State court." *Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 616 (4th Cir. 2001) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988)).

Additionally, our case law makes clear that when a district court declines to exercise supplemental jurisdiction pursuant to § 1367(c), that decision is reviewed for abuse of discretion. *Jordahl v. Democratic Party of Va.*, 122 F.3d 192, 203 (4th Cir. 1997); *see also Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995) ("The doctrine of supplemental jurisdiction 'thus is a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in the manner that most sensibly accommodates a range of concerns and values.'" (quoting *Carnegie-Mellon*, 484 U.S. at 350)). We then evaluate that decision based on the factors listed in statute: "whether the State claims involve novel or complex issues of State law; whether State law claims predominate; whether the federal claims justifying the court's jurisdiction remain[] in the case; or other compelling reasons." *Hinson*, 239 F.3d at 617.

What we are presented with in this case is the opposite situation—the district court opted to *exercise* jurisdiction rather than *decline* it—and now we are reviewing that decision. It appears that we are effectively, through the majority's holding and our Court's case law, imposing an abuse of discretion review on a district court that chooses to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 rather than decline it under § 1367(c). And it appears that we are using the same factors by which we evaluate discretion to decline jurisdiction to evaluate discretion to exercise jurisdiction. I have no

30

qualms with doing so; however, I believe we do a disservice to future litigants and the District Judges of this Circuit if we are not so clear in what we are doing.[7]

## III.

The circumstances of this case are both tragic and entirely avoidable. The district court recognized this in dismissing the complaint:

> [T]he legal conclusion reached is not intended to excuse Arlington County from failing to take action it should have taken to avoid the unjust arrests, including a more diligent investigation and requesting to withdraw meritless arrest warrants. Notwithstanding the [findings on immunity], most fair-minded people would conclude that it would be appropriate—indeed, even necessary—for Arlington county to extend to [P]laintiffs a formal and sincere apology for what occurred, and perhaps that legislative relief in the form of a special bill would be appropriate here.

*Safar*, 178 F. Supp. 3d at 358 (citation omitted). I echo these sentiments here, but must concur in the judgment of my colleagues that if any duty for Officer Rodriguez existed, it was not clearly established.

---

[7] Without this clarity, we may appear to be endorsing an improper abstention path which would go against our "virtually unflagging obligation . . . to exercise the jurisdiction given [us]." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (citations omitted); *see also Wohl v. Keene*, 476 F.2d 171, 174 (4th Cir. 1973) ("Abstention is *not* appropriate solely to avoid the decision of difficult state law questions." (citations omitted)). I do not understand the majority to be doing this.