**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 27, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

ADRIENNE LOPEZ,

      Defendant - Appellant.

_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

ANGELA MARIE LOPEZ,

      Defendant - Appellant.
_____

No. 15-3130

No. 15-3134

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 5:13-CR-40065-DDC-6 & 7)**
_____

John C. Arceci, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Denver, Colorado, for Defendant-Appellant Adrienne Lopez.

Sean C. McEnulty, Attorney at Law, McNulty Law Firm, P.A., Wichita, Kansas, for Defendant Angela Marie Lopez.

James A. Brown, Assistant United States Attorney (Barry R. Grissom, with him on the brief), Office of the United States Attorney, Topeka, Kansas, for Plaintiff-Appellee.

_____

Before **KELLY**, **HARTZ**, and **MATHESON**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Defendants Adrienne Lopez and Angela Lopez, no relation, appeal their convictions and sentences on charges of possessing methamphetamine with intent to distribute and conspiracy to do so. We need not address most of their arguments because we agree with them that the methamphetamine found in their car must be suppressed. They were properly stopped because Angela was speeding. But the officer did not have reasonable suspicion to continue their detention to obtain a drug-detection dog after he issued Angela a warning and Defendants refused to consent to a search of their vehicle. As alternative grounds for affirming the admission of the evidence, the government argues (1) that Adrienne cannot complain of the search because it was not a fruit of her detention and (2) that the continued detention was lawful anyway because there was probable cause to arrest Angela for driving without a license. We reject both arguments. The search of the vehicle was based on the dog's alert to marijuana in Adrienne's purse and the police dispatcher informed the officer on the scene that Angela had a valid license.

I. **BACKGROUND**

At 3 p.m. on June 21, 2013, Angela was driving a 2013 Dodge Avenger eastbound on U.S. Route 54 toward Wichita. Kansas Highway Patrol Trooper Robert Krause pulled

the car over for going 79 miles per hour in a 65-mile-per-hour zone. Krause had graduated from the police training academy six months earlier and had worked as a solo patrolman for two months. The stop was recorded on Krause's dashboard camera. He approached the driver's side of the Dodge and told Defendants that he had pulled them over for speeding. The passenger, Adrienne, asked where they were speeding, and Krause told her. Throughout the encounter Adrienne, rather than Angela, the driver, did almost all the talking, which Krause said can be a sign of nervousness.

After being told that the car was a rental, Krause asked Angela for her license, insurance, and car-rental paperwork. While Angela looked for those documents, Krause turned his attention to the backseat. Immediately, Adrienne said, "Don't look back there, it's a mess." Gov't Suppression Hr'g, Ex. 1, Videotape of Traffic Stop at 1:38–1:42 (Videotape). The backseat was not particularly messy; only a few bags and a blue cooler were on the seat.

Krause then asked the women about their travel plans. Adrienne told him that they were coming from California and headed to "Kansas City or Nebraska" to rescue her sister "because she was getting beat up by her boyfriend." R. at 507, Suppression Hr'g at 18 (Suppression Hr'g). At that point Angela handed him her documents. Instead of her license she provided a receipt from the California Department of Motor Vehicles that was issued to her when she reported losing her license. The rental paperwork stated that the

car was rented in El Monte, California, at 5:30 p.m. on June 20 for two days, to be returned to the same location.[1]

Krause asked the women if they had any drugs, such as marijuana, methamphetamine, or heroin, in the car. They replied no, but Adrienne added that she needed some marijuana because the drive was taking too long. This prompted Krause to inquire further into their travel plans. They told him that they left California at about 6 p.m. the night before and drove through the night. When asked if they stopped a lot, Adrienne replied, "a lot, too much." Videotape at 3:38–3:40. With that, Krause returned to his car to check Angela's documents.

Krause relayed Angela's information to the dispatcher and learned that she had a valid driver's license and no criminal history. He reapproached the driver's side of the car, returned Angela's paperwork, and warned her for speeding and not having her license. Adrienne thanked him and asked whether a person can get in trouble for not having her license when driving. Krause explained that she could. He then told Defendants to have a safe trip and turned to walk away.

After taking four steps away from the Dodge, Krause turned around and walked to the driver's side window. He asked Angela if she minded answering a few more questions, and she consented. He again asked her where they were headed, and again Adrienne interceded, saying that she did not know the exact city because her cell phone

---

[1]  The rental document states the return time as 11:30 a.m., rather than 5:30 p.m., on June 22, while also showing that the anticipated charge would be for two full days at $61.80 per day. The government has not suggested any possible nefarious reason for the apparent discrepancy.

had not been working for the past two hours. Krause asked Defendants if they were related, and they gave different answers. Talking over each other, Angela said that they were friends, while Adrienne said that they were cousins. Adrienne then explained that they had known each other for a very long time but were not related.

Krause next asked Defendants if he could search their vehicle, explaining that drugs were frequently trafficked on Route 54 and he was suspicious of their two-day car rental. After some hesitation they refused to consent. Nevertheless, Krause detained them until a drug dog could be ferried to their car. Twenty minutes later, the drug dog arrived with its handler. With Defendants standing away from the car, the dog sniffed around the car's exterior, then jumped through the open front passenger window and alerted on Adrienne's purse below the front seat. Adrienne admitted having some marijuana in her purse. Krause found the marijuana and proceeded to search the rest of the car. He found four vacuum-sealed packages beneath some ice water at the bottom of the blue cooler on the backseat. After calling his lieutenant to check if he could lawfully open the packages, he discovered what was later determined to be 1,766 grams (about four pounds) of 100% pure methamphetamine.

The United States District Court for the District of Kansas denied Defendants' motions to suppress. They were convicted by a jury of possessing more than 500 grams of methamphetamine with intent to distribute, and of conspiracy to do the same. *See* 21 U.S.C. §§ 841, 846. Defendants appeal. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse.

## II. ANALYSIS

 "When reviewing [the denial of] a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless they are clearly erroneous, and review de novo the ultimate question of reasonableness under the Fourth Amendment." *United States v. Pettit*, 785 F.3d 1374, 1378–79 (10th Cir.), *cert. denied*, 136 S. Ct. 282 (2015).  A traffic stop must be justified at its inception and, in general, the officer's actions during the stop must be reasonably related in scope to the circumstances that initially justified it.  *See United States v. Davis*, 636 F.3d 1281, 1290 (10th Cir. 2011).  A stop may, however, be extended beyond that scope if the person stopped consents to the extension or if the police have a reasonable suspicion that other illegal activity has occurred or is occurring.  *See United States v. Moore*, 795 F.3d 1224, 1229 (10th Cir. 2015).

Defendants do not contest the initial stop, and the government does not contest that Krause extended the stop beyond its initial purpose (enforcing traffic laws) without Defendants' consent.  The propriety of the search depends solely on whether further detention to await the drug dog was lawful because Krause had reasonable suspicion that Defendants were engaged in criminal activity.  The government bears the burden of proving reasonable suspicion.  *See Pettit,* 785 F.3d at 1379.  The officer must be able to articulate particular objective facts from which it is reasonable for a trained, experienced officer to believe that criminal activity is afoot.  *See United States v. Arvizu*, 534 U.S. 266, 277 (2002); *United States v. Simpson*, 609 F.3d 1140, 1146–47 (10th Cir. 2010).  The determination is based on the totality of the circumstances; reasonable suspicion can

**6**

be founded on a combination of factors that individually may be susceptible of innocent explanation. *See Arvizu*, 534 U.S. at 277–78.

### A. Legality of Continued Detention

We hold that Krause did not have reasonable suspicion to prolong the stop to await the drug dog. The government points to three suspicious factors justifying detention: (1) Adrienne was nervous; (2) Adrienne asked Krause not to look at the backseat because it was messy even though it was not; and (3) Defendants' travel plans were implausible.[2] As for Adrienne's nervousness, we have consistently assigned this factor limited significance because its measure is so subjective and innocent people can vary widely in how they respond to an encounter with police. *See Pettit*, 785 F.3d at 1380. Only *extreme* nervousness can substantially contribute to reasonable suspicion. *See id.* ("[W]e require specific indicia that the defendant's nervousness was extreme . . . ." (internal quotation marks omitted)). The district court did not find that either Adrienne or Angela was *extremely* nervous, Krause did not so testify, and it is not apparent on the videotape of the encounter. At the suppression hearing Krause recalled that he and Adrienne were having a "casual conversation," with the only suggestion of nervousness being that Adrienne was overly talkative. Suppression Hr'g at 68. And even that suggestion of nervousness had an explanation. Given Adrienne's story that it was *her* sister who was

---

[2] The district court also noted that Adrienne had a record of drug offenses. But Krause did not learn about her record before he detained Defendants to await the drug dog. As the government concedes, he therefore could not rely on her record to support reasonable suspicion. Also, we do not consider that Adrienne falsely stated that she and Angela were cousins or that Adrienne stated that she wanted some marijuana, because the government does not rely on these facts and neither did the district court.

7

being abused and that she recruited Angela to come along on the rescue mission, it would make sense for her, rather than the driver, to be the one communicating with Krause.

Adrienne's comment about the backseat also is very little support for reasonable suspicion. With the benefit of hindsight, the comment seems revealing, because methamphetamine was hidden in the blue cooler. One could surmise that Adrienne was concerned that the officer was looking in the backseat, blurted out that he should not look there, and then, realizing that she had to give a reason for him not to look, concocted the silly reason that the backseat was messy. But at the time she made her comment, there was nothing incriminating in view on the backseat, and her comment could hardly have dissuaded Krause from taking a closer look through the back window. At best, Adrienne's comment was a cue for Krause that something was odd and he should be alert for evidence of crime.

The evidence he found, however, was inadequate. The government's chief justification for expanding the traffic stop is Defendants' allegedly implausible travel plans. But Adrienne's fictionalized account held together rather well. Given the purpose of the trip—to rescue a sister from an abusive boyfriend—the travel plans made sense. Adrienne would want to act as quickly as possible to get to her sister and bring her to safety. A last-minute airline flight could be quite expensive, and driving might be a more flexible way to rescue her sister and some of her things. To travel through the night required recruiting a companion to share the driving. Trying to make the round-trip within the time limits of the rental agreement might well have been overly ambitious (or foolish, because they were traveling more than 20% too fast when stopped), but if they

**8**

did not spend too much time in Kansas City (or Nebraska), it could be reasonable to rent only for two days rather than three. Although Krause testified at the suppression hearing that his suspicions were aroused because "[i]t's not normal for somebody to rent a car for two days and travel halfway across the country and expect to be back," Suppression Hr'g at 20–21, Adrienne gave an explanation for the rapid travel. Even the vagueness of the final destination—Nebraska or Kansas City—was understandable if the sister needed to move to protect herself from her boyfriend. Kansas City is about 100 miles from the Nebraska border, so the vagueness of the destination still had the rescuers going in the correct direction (plausibly assuming that any destination in Nebraska would be in the part of the state closest to Kansas City), and the rescuers would not need more precise directions until they were closer to Kansas City. Adrienne explained that she did not yet have the final destination because her cell phone had not been working, and Krause testified that cell service in the area of the stop could be unreliable.

Perhaps additional questioning of Defendants (particularly if they were not together) would have elicited internal contradictions, inconsistencies between their stories, or inexplicable vagueness. We have said that such flaws in purported travel plans can be a significant factor in assessing reasonable suspicion. *See Davis*, 636 F.3d at 1292 (driver and passenger gave conflicting accounts of travel plans); *Simpson*, 609 F.3d at 1149 ("[L]ies, evasions or inconsistencies . . . may contribute to reasonable suspicion."); *United States v. Kopp*, 45 F.3d 1450, 1453–54 (10th Cir. 1995) (noting evasions and inconsistencies). But Krause did very little to pursue his suspicions, and he uncovered no flaws of that nature.

Although our precedents may not be totally consistent in this regard, we have generally been reluctant to give weight in the reasonable-suspicion analysis to unusual travel purposes, at least absent lies, inconsistencies, or the like. For example, in *United States v. Wood*, 106 F.3d 942, 944 (10th Cir. 1997), the driver said that he was an unemployed painter in Kansas who had flown with his sister to California for a two-week vacation and was returning in a rental car to view the scenery while his sister had flown back. The district court found it "implausible that an unemployed painter in Kansas could afford to take a two-week vacation in California, to fly there one way in a commercial airplane, to rent a 1995 Mercury Marquis in California, and then to drive the rental car back to Kansas." *Id.* at 946 (brackets and internal quotation marks omitted). But, we said, "[t]here is nothing criminal about traveling by car to view scenery." *Id.* at 947. We reasoned that since the driver was unemployed and not expecting to return to work for six weeks, he had time for a leisurely vacation and he may have saved money for the trip. *See id.* Similarly, in *United States v. Salzano*, 158 F.3d 1107 (10th Cir. 1998), the trooper was suspicious that the driver would rent a motorhome to drive from California to Massachusetts to visit his father instead of making the more economical choice of flying or renting a smaller vehicle, especially because the driver was the only person in the vehicle. *See id.* at 1110–11, 1113 n.2. We disagreed, explaining that the driver said he planned to drive his father back to California and he "may have chosen to travel by motor home in order to save on lodging costs, to avoid the hassles of finding accommodations that accept large pets such as his dog, and to enable him and his father

**10**

to visit relatively out-of-the-way locales where temporary lodging is not readily available." *Id.* at 1112.

When we have said that reasonable suspicion is buttressed by simply the implausibility of purported travel plans (when there were no inconsistencies, internal contradictions, or vagueness), it has been because it begged credulity to think that the purported purpose of the trip could justify the travel plans, as when the suspect says that he had driven 1200 miles just to spend a day with relatives and was now driving back, *see United States v. Contreras*, 506 F.3d 1031, 1036 (10th Cir. 2007); or had driven "across the country from New York to California for a one-and-a-half-day visit during which he purchased a not-unusual used vehicle for $4,000," gave a California address for the registration, and was driving the car back, *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1260 (10th Cir. 2006); or is making a round-trip across the country just to deliver a dilapidated sofa to friends, *see Kopp*, 45 F.3d at 1453–54. As we have explained, however, Defendants' travel plans were quite consistent with the trip's purported purpose of rescuing a sister in danger. In our view, the fit between purpose and travel plans was at least as good as in *Wood* and *Salzano*.

This is a close case. But viewing the totality of the circumstances in light of our precedents, the particularized objective facts did not suffice to justify continuing the detention of Defendants. The evidence seized from the car must be suppressed.

**11**

### B. Government's Fallback Arguments

The government argues that even if there was not reasonable suspicion justifying the continued detention, the evidence should not be suppressed. It has separate arguments relating to Adrienne and Angela.[3]

### 1. Adrienne

The government argues that the evidence is admissible against Adrienne because the discovery of the methamphetamine was not the fruit of her unlawful detention. It relies on our opinion in *United States v. DeLuca*, 269 F.3d 1128 (10th Cir. 2001). In that case the police seized drugs from the trunk of a car that had been unlawfully detained after an initial lawful stop. *See id.* at 1130–31. Mr. DeLuca was in the car but was neither the driver nor the owner. *See id.* at 1130. We said that Mr. DeLuca ordinarily would not have standing to challenge the search of the car because he did not have a possessory or ownership interest in it, but that he could have the evidence suppressed if it had been found as the fruit of his own unlawful detention. *See id.* at 1133. To prevail, he needed to show that the drugs "would never have been found but for *his*, and only his, unlawful detention." *Id.* We concluded, however, that there was not a sufficient factual nexus between Mr. DeLuca's detention and the discovery of the drugs. *See id.* at 1135. In the circumstances of that case, the only possible way for him to show such a nexus was by providing evidence that he would have been permitted to leave the scene in the

---

[3] Although the district court did not reach these arguments, the government preserved them by raising them below.

detained car if he had asked to do so. *See id.* at 1133. He made no such showing, so the evidence was admissible against him.

Not so with Adrienne. *DeLuca*'s requirements were satisfied here. When the drug dog arrived and sniffed around the car's exterior, it jumped through the open front passenger window and alerted on Adrienne's purse under the front seat. Adrienne then admitted having some marijuana in her purse. Krause seized the marijuana and proceeded to search the rest of the car, discovering the methamphetamine in the cooler on the backseat. Thus, it was the detention of Adrienne's personal property, her purse, that led to the search of the car and the discovery of the methamphetamine. We hold that this was a sufficient nexus to give her standing to challenge the admission into evidence of the drugs.

### 2. Angela

The government's argument regarding Angela would sustain the admission of the evidence against both Angela and Adrienne. It contends that even absent reasonable suspicion, the detention was lawful because there was probable cause to arrest Angela for driving while not in possession of her driver's license. *See* K.S.A. § 8-244. We agree that if there was probable cause to arrest for a crime, it does not matter whether the officer subjectively detained the person for that crime. *See Whren v. United States*, 517 U.S. 806, 813 (1996) (constitutional reasonableness does not depend on actual motivations of individual officers involved). The problem for the government is that there was not probable cause to arrest Angela.

To begin with, we question whether the document Angela gave to Krause—the receipt from the California Department of Motor Vehicles—would not be a "driver's license" under the Kansas statute. (It apparently sufficed for the rental company to let her take the car.) But even if it was not the requisite license, Krause did not have probable cause to arrest her when the detention was continued to await the drug dog. To be sure, the Kansas statute requires every licensee to "have his or her driver's license in his or her immediate possession at all times when operating a motor vehicle." K.S.A. § 8-244. It goes on to say, however, that "no person charged with violating this section shall be convicted if such person produces in court or the office of the arresting officer a driver's license theretofore issued to such person and valid at the time of arrest." *Id.* Upon learning from the dispatcher that Angela had a valid driver's license in California, Krause had enough information to know that Angela could not be convicted for this offense. An officer does not have probable cause to arrest a person for a crime when he knows she could not be convicted. *See Brown v. Fisher*, 251 F. App'x 527, 534 (10th Cir. 2007) (expressing doubt that officer could arrest driver for violation of this very statute when officer knew that driver was licensed); *see also United States v. Edwards*, 632 F.3d 633, 640 (10th Cir. 2001) ("If the police learn information that destroys their probable cause to arrest a defendant, the arrest may become illegal.")

## CONCLUSION

We **REVERSE** Defendants' convictions and **REMAND** to the district court for proceedings consistent with this opinion.

**14**