FILED
**United States Court of Appeals**
**Tenth Circuit**

**October 3, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

RICHARD DATES,

    Defendant - Appellant.

No. 16-2267
(D.C. No. 1:12-CR-02211-MCA-1)
(D.N.M.)

**ORDER AND JUDGMENT**[*]

Before **TYMKOVICH**, Chief Judge, **MORITZ** and **EID**, Circuit Judges.

Defendant-Appellant Richard Dates conditionally pled guilty to distribution of child pornography and was sentenced to ten years' imprisonment. He reserved his right to appeal the district court's denial of his motion to suppress inculpatory statements that he made during a morning exchange with federal agents. The district court denied the suppression motion, ruling that Dates's statements were made during a consensual encounter, not during a Fourth Amendment seizure or custodial interrogation under *Miranda v. Arizona*, 384 U.S. 436 (1966). We agree and affirm.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Over Skype, an individual with the display name "walrus.blackhawk" solicited "hardcore" images from a man in a child pornography ring. Supp. R., Vol. III, at 159–65. That man sent walrus.blackhawk pornographic JPG images featuring children. *Id.* The Department of Homeland Security ("DHS") tracked the walrus.blackhawk username to the email address walrusblackhawk@hotmail.com, registered to one Richard Dates living in Grants, New Mexico. *Id.* at 162–65.

DHS Agents Allen and Garcia visited Dates's apartment on the morning of August 23, 2012. *United States v. Dates*, Crim. No. 12-2211, slip op. at 1 (D. N.M. 2015) ("Order"). Both officers were dressed in plain clothes and, though armed, did not display their firearms at any time during their interaction with Dates. *Id.* at 3. Agent Garcia knocked on Dates's door at about 7:00 a.m. *See id.* at 1; Supp. R., Vol. III, at 4:22–5:10. After introducing himself and Agent Allen, Agent Garcia stated, "[w]e'd like to talk to you about a current investigation that we're working on—someone else that may have your email address." Supp. R., Vol. III, at 5:12–14. "Okay," Dates replied, "[w]e can talk out here." *Id.* at 5:15, 19. Agent Garcia explained that he would like to discuss whether Dates used certain email addresses to determine whether those addresses had been compromised. *Id.* at 5:25–6:13. Dates stated "[w]ell, I don't think I really want to talk to you right now." *Id.* at 6:14–15. "When would you like to talk to us about that," Agent Garcia asked. *Id.* at 6:16–17. "I don't know," Dates answered, "I don't know what you're looking for." *Id.* at 6:18, 21–22. Garcia told Dates that he would be "more than happy" to explain the investigation in detail. *Id.* at 7:6. Dates explained that he had

to leave for work soon, but nevertheless stated, "[w]ell, you can go ahead. We can talk out here." *Id.* at 7:14–15.

Agent Garcia asked Dates if he owned a computer. *Id.* at 7:16–17. Dates then stated: "I don't want to talk to you. I don't know what you want and I don't want to talk to you at this particular time." *Id.* at 7:19–21. Agent Garcia explained that he was asking whether Dates owned a computer. *Id.* at 7:25–8:1. Dates replied:

> MR. DATES: I don't want to talk to you about anything. I don't know what you're driving at. So you'd have to—I—you know, you'd have to— you know, we can meet someplace else.
>
> SPECIAL AGENT GARCIA: Okay. Tell me where you would like to meet at.

Supp. R., Vol. III, at 8:2–5. Dates said that he would like to go to McDonald's after he dressed for work. *See id.* at 8:6–16. Agent Garcia asked if it would be okay if he waited outside while Dates dressed. *Id.* at 8:23–25. Dates said yes and shut his door, locking the agents outside his home. Order at 3. When Dates emerged a little over five minutes later, Agent Garcia again asked Dates if he wanted to go to McDonald's, and Dates confirmed that he did. *See* Supp. R., Vol. III, at 8:23–9:10. Agent Garcia then asked:

> SPECIAL AGENT GARCIA: Do you want to go with us, or do you want us to follow you?
>
> MR. DATES: No, I'll go with you.
>
> SPECIAL AGENT ALLEN: Okay.
>
> SPECIAL AGENT GARCIA: Okay. Great. Very good. Why don't you come in here, Mr. Dates. Come sit back here and I'll sit back here with you. Then I can go up town with you and let you know what's kind of going on. How's that?

3

MR. DATES: All right.

*Id.* at 9:11–20.

Within two minutes on the drive to McDonald's, Dates revealed that walrusblackhawk@hotmail.com was his email address. *Id.* at 12:3. Dates later confirmed that walrus.blackhawk was his Skype display name. *Id.* at 79:20. During the ride, Dates periodically told Agent Allen to slow down or at what streets to make a turn. *See, e.g.*, *id.* at 13:4–15. Agent Garcia questioned Dates about the substance of his Skype conversations, including whether Dates had ever seen child pornography. *See id.* at 24:14–25:12. Dates replied, "I don't want to talk about that—whether I've seen it or— you know, that's none of your business at this point." *Id.* at 25:10–15. Garcia asked whether Dates had ever participated in Skype conversations about child pornography. *See id.* at 25:17–20. "I wouldn't want to answer anything like that," Dates replied. *Id.* at 25:21–22. "When you say you wouldn't want to, does that mean—" Garcia began. *Id.* at 25:23–24. "No. It means what I said," Dates repeated. *Id.* at 26:2.

Agent Allen parked at McDonald's and then stood outside the car while Agent Garcia continued to ask Dates questions. After Dates unequivocally stated that he wanted a lawyer and asked to be driven home, Agent Garcia stepped outside the car to confer with Agent Allen. *See id.* at 40:3–42:5. Agent Garcia returned to ask Dates if he would like a coffee or to use the restroom and Dates said no. *See id.* at 42:23–43:8. The agents then drove Dates back to his home. *See id.* at 48:2–5 (Dates giving agents directions back to house).

Using the statements Dates made during the drive to McDonald's, Agents Allen and Garcia obtained a search warrant for Dates's home. *See* Order at 6–7. The warrant permitted DHS agents to search Dates's residence for devices capable of accessing the internet. *See* I ROA, at 57. The search uncovered two laptop computers and a four gigabyte thumb drive—each containing child pornography. *See* Supp. R., Vol. III, at 236.

A federal grand jury indicted Dates on September 5, 2012. Dates was later charged in a second superseding thirteen-count indictment on June 24, 2014. *See* I ROA, at 77–83 (Indictment). All thirteen charges involved the receipt, advertisement, distribution, and possession of "visual depiction[s] . . . of . . . minor[s] engag[ed] in sexually explicit conduct," in violation of 18 U.S.C. §§ 2251–2252, 2256 (2012). *See id.*

Dates moved to suppress the statements that he made to Agents Garcia and Allen during the car ride to McDonald's. *See* I ROA, at 17–25 (Motion to Suppress). The district court denied Dates's motion in a written order, ruling in relevant part that the encounter was consensual and so did not implicate the Fourth Amendment or *Miranda*. Order at 4. The district court found that the agents were wearing plain clothes, did not brandish their firearms, did not touch Dates, and spoke politely using a non-threatening tone of voice. *Id.* at 3. The court also found that the agents did not object when Dates locked them outside his home for about five minutes while he dressed. *Id.* In addition, the court found that Dates proposed the McDonald's meeting place, "chose to ride with the agents rather than take his own car," and chose the route to McDonald's. *Id.* When Dates unequivocally asserted his right to speak to a lawyer, he was returned home. *Id.*

5

The district court noted that although Agent Garcia's questions were "persistent and intrusive," the "encounter [was] consensual, both at its inception and throughout." *Id.* at 4.

Dates conditionally pled guilty to Count Two of the second superseding indictment. *See* Supp. R., Vol. VII, at 20 (Plea Agreement). He reserved his right to appeal the denial of his suppression motion. *Id.* at 26. The court sentenced Dates to ten years' imprisonment. *Id.* at 31–36 (Criminal Judgment). This appeal followed.

## II.

When reviewing a district court's denial of a motion to suppress, we look at "the evidence in the light most favorable to the government," and "accept the district court's findings of fact unless they are clearly erroneous." *United States v. McNeal*, 862 F.3d 1057, 1061 (10th Cir. 2017) (quoting *United States v. Lopez*, 849 F.3d 921, 925 (10th Cir. 2017)). We review de novo the ultimate legal determination that suppression is unwarranted. *Id.*

On appeal, Dates seeks to suppress his statements on two grounds: First, that the morning encounter with federal agents was an unreasonable seizure; and second, that the encounter constituted a custodial interrogation in violation of *Miranda*.[1] We consider each in turn.

---

[1] Dates does not appeal two arguments he made below: (1) that his inculpatory statements were given involuntarily in violation of the Fifth Amendment, *see* I ROA, at 20; and (2) that his statements were obtained after he had invoked his right to consult counsel, *id.* at 22–23. The district court ruled that Dates's statements during the car ride were voluntary and that his right to counsel under the Fifth and Sixth Amendments had not yet attached. Order at 4–5. Because Dates does not appeal either ruling, we consider the agents'

A.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. Before assessing whether the actions of law enforcement constituted an *unreasonable* seizure, we first ask whether a seizure occurred. There are three types of police-citizen encounters: (1) a consensual encounter, which does not constitute a seizure and therefore does not implicate the Fourth Amendment; (2) an investigative detention, which must be justified by reasonable suspicion of criminal activity; and (3) an arrest, which must be justified by probable cause. *See United States v. Roberson*, 864 F.3d 1118, 1121 (10th Cir. 2017); *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017). The district court determined that Dates's car ride to McDonald's with Agents Garcia and Allen was a consensual encounter and therefore did not constitute a seizure. Order at 4.

"[M]ere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Rather, a police-citizen encounter is a seizure "[o]nly when" the officer restrains the freedom of the suspect by "physical force," *id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)), or by show of authority and the suspect "submi[ts] to the assertion of authority" by an officer, *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphasis omitted). To determine whether law enforcement seized a suspect through a show of authority, we ask "whether the officer's words and actions would have conveyed . . . to a reasonable person . . . that the defendant was not free to leave." *Id.* at

conduct only as it may pertain to Dates's Fourth Amendment and *Miranda* claims. *See Home Loan Inv. Co. v. St. Paul Mercury Ins. Co.*, 827 F.3d 1256, 1268 (10th Cir. 2016); Fed. R. App. P. 28(a)(8).

7

628. That inquiry is an "objective one." *Id.* We examine the characteristics of the officer's actions and the effect that they would have on a reasonable person—not the defendant's subjective perceptions. *See Bostick*, 501 U.S. at 438. Unless the officer's actions are "so intimidating" that a reasonable person would not feel free terminate the encounter, the suspect has not been seized. *See I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984).

This court considers the totality of the circumstances in assessing whether a reasonable person would have felt free to terminate an encounter with law enforcement. *See United States v. Lopez*, 443 F.3d 1280, 1286 (10th Cir. 2006). In *Lopez*, we enumerated a non-exhaustive list of factors to distinguish a seizure from a consensual encounter, including:

> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

*Id.* at 1284 (quoting *United States v. Spence*, 397 F.3d 1280, 1283 (10th Cir. 2005)).

Applying the *Lopez* factors, the district court determined that Dates's morning encounter with law enforcement was consensual because a reasonable person in Dates's position would have felt free to terminate the interview with the agents. *See* Order at 3–4. The district court found that Agents Garcia and Allen wore plain clothes, did not brandish their weapons, and did not touch Dates. Order at 3. The court also found that

8

Dates stopped the agents at the threshold of his home rather than inviting them inside, locked the agents outside for just over five minutes while he dressed, selected McDonald's as the location of their breakfast meeting, and decided to ride in the agents' car after he was given the choice to drive himself. *Id.* The district court noted that although Agent Garcia's questions were "persistent and intrusive," the "encounter [was] consensual, both at its inception and throughout." *Id.* at 4.

Considering the totality of the circumstances, we agree with the district court that a reasonable person in Dates's position would have felt free to terminate the encounter with law enforcement. We therefore affirm the district court's conclusion that Dates's inculpatory statements were given during a consensual encounter, not a Fourth Amendment seizure.

Dates contends that the encounter was a seizure due to Agent Garcia's persistent and deceptive questioning amid Dates's "repeated attempts to end the conversation." Aplt. Br. at 16. Dates also argues that the location of the exchange—the threshold of his home, then the backseat of the agents' car—enhanced the coercive force of Agent Garcia's questions. *See id.* at 17. According to Dates, these circumstances, taken together, establish that he was seized. *See id.* at 17–18. We disagree.

Starting with the persistent nature of Agent Garcia's questions, the Supreme Court has "held repeatedly" that police questioning is not a seizure "so long as the officers do not convey a message that compliance . . . is required." *Bostick*, 501 U.S. at 434, 437 (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality)). Here, Agent Garcia did

not objectively convey to Dates that compliance with the DHS investigation was required. His persistent questions were in response to Dates's conflicting answers.

For example, after Agents Garcia and Allen introduced themselves as federal agents and explained that they wanted to speak with Dates, he replied "[o]kay . . . [w]e can talk out here." When Agent Garcia explained that someone may have stolen Dates's email address, Dates replied, "I don't think I really want to talk to you right now." After Agent Garcia offered to explain the nature of the investigation and assured Dates that he only needed a few minutes, Dates changed his mind: "Well, you can go ahead. We can talk out here." When Dates was asked about his computer, he changed his mind again, stating, "I don't want to talk to you. I don't know what you want and I don't want to talk to you at this particular time." Agent Garcia explained: "Well, I mean, that's what I'm asking you. Do you own a computer?" Dates replied, "I don't want to talk to you about anything. I don't know what you're driving at." But then Dates continued: "[Y]ou know, we can meet someplace else."

While Agent Garcia's questions were persistent, they also reflect a reasonable effort to understand whether or not Dates wanted to cooperate. Agent Garcia did not badger or harass Dates; rather, each time Dates indicated he did not want to talk he subsequently changed his mind, allowing Agent Garcia to ask additional questions. Moreover, after offering to meet the agents at McDonald's, Dates broke off the interview by locking the agents outside his home for five minutes while he prepared for work. During that period of time, outside of the agents' presence, a reasonable person in Dates's position could have reconsidered his decision. But when Dates came back outside he

10

resumed the conversation by confirming to the agents that he wanted to go to McDonald's. Agent Garcia then gave him the choice to drive alone, but Dates instead decided to ride with the agents in their car. Two minutes into the drive came the "crucial admission," Aplt. Br. at 15: Dates revealed that "walrusblackhawk" was his email address. Under these circumstances,[2] we cannot conclude that Agent Garcia "convey[ed] a message that compliance with [his] requests [was] required." *See Bostick*, 501 U.S. at 435.

Dates also argues that his statement to Agent Garcia, "we can meet somewhere else"—rather than being consent to in fact meet somewhere else—was really "a request to end the confrontation." Aplt. Br. at 14–15. Perhaps that is what Dates subjectively meant, but the objective meaning of his statement was a suggestion that the conversation continue away from his front door. Indeed, Dates may have proposed McDonald's and decided to ride with the agents because he sought privacy. *See, e.g.*, *United States v. Jones*, 523 F.3d 1235, 1242 (10th Cir. 2008) (noting that it "was perfectly sensible for [Agent] Bridge to be cognizant of Jones's privacy and ask to speak inside his car, thus preventing passersby from learning of Jones's methamphetamine use"); *United States v. Little*, 18 F.3d 1499, 1504 n.5 (10th Cir. 1994) (en banc) (acknowledging that some persons could feel "more 'coerced' in a public setting, where they might be embarrassed to decline police requests in the hearing and view of others"). We conclude that Dates's offer to meet the agents at McDonald's supports the conclusion that the morning

---

[2] We focus our attention on the circumstances that preceded Dates's admission regarding his email address, as it only is those circumstances that could have possibly constituted a seizure at the time of the admission.

11

encounter was consensual because it demonstrates that he was dictating the location where the conversation would occur.

Next, Dates points to the agents' use of deception as turning the encounter from consensual to a seizure. However, the deception does not change our conclusion. The question is whether the agents' false statements would have made a reasonable person feel unable to "decline the [agents'] requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 436. We conclude that the agents' false statements implying that Dates was a putative victim of online identity fraud rather than a criminal suspect would not have conveyed to the reasonable person that they were not free to leave. Indeed, unlike false statements that incriminate the suspect, *see, e.g.*, *Oregon v. Mathiason*, 429 U.S. 492, 495–96 (1977) (falsely telling the suspect that his fingerprints were found at a crime scene); *Frazier v. Cupp*, 394 U.S. 731, 737–38 (1969) (falsely telling the suspect that his confederate has confessed), the agents' purported ignorance of Dates's criminal activity would, if anything, make the reasonable person feel *greater* freedom to terminate the encounter.

Dates does not identify any precedent where deception by law enforcement turned a consensual encounter into a Fourth Amendment seizure. Instead, Dates cites cases such as *United States v. Harrison*, 639 F.3d 1273 (10th Cir. 2011), which involves whether a defendant has voluntarily consented to a warrantless search, *id.* at 1278. For example, in *Harrison*, we held that a defendant's consent to search was involuntary where officers deceived the defendant into thinking that they needed access to his apartment to search for a bomb. *See id.* at 1281. Under such circumstances, we concluded, the defendant

12

could "deny consent to search and accept the risk that a bomb had been planted in the apartment," or "consent to search." *Id.* at 1280. Consent under those circumstances could not be deemed to be voluntary. *Id.* Here, Dates has waived his voluntariness argument by not raising it before this court. *See supra* n.1. We therefore find these cases inapposite. More fundamentally, Dates does not argue that the agents' deception would render a reasonable person unable to terminate the encounter, which is the pertinent inquiry in this case.

Additionally, Dates contends that the location of the morning encounter—the threshold of his home and then in the backseat of the agents' car—suggests that a seizure occurred. We are unpersuaded.

Dates's actions at his home fortify the district court's conclusion that a reasonable person in Dates's position would have felt free to terminate the exchange with law enforcement. Dates chose to "speak to [the agents] at the threshold of his apartment, rather than inviting them inside," and then "shut the front door, locking the agents outside for several minutes while he dressed." Order at 3. Those acts suggest that a reasonable person in Dates's position would have understood he did not have to comply with the agents' requests for information.

We also reject Dates's suggestion that he was "lured" into the agents' car. Aplt. Br. at 17. The district court expressly found that "Defendant [Dates], rather than the agents, proposed that he meet with the agents at a McDonald's restaurant. Defendant chose to ride with the agents rather than take his own car." Order at 3. Indeed, when Dates was asked at his sentencing hearing whether he "told [the agents that he] wanted to

13

ride with them," Dates replied, "[y]eah. I thought it would be simpler than trying to take two cars." Supp. R., Vol. IV, at 376. In other words, Dates was not coerced into accompanying the agents to McDonald's; he simply thought it made more sense for the three men to ride to McDonald's together.

Dates next argues that the car ride was a seizure because he was unable to exit a moving vehicle. But the Court has held that police may question a suspect in a constraining situation that the suspect voluntarily entered, such as a bus. *See United States v. Drayton*, 536 U.S. 194, 201–04 (2002) (holding that plain clothes police officers did not seize bus passengers after they boarded the bus and began asking questions without advising that the passengers had a right to not cooperate). Though exit is sometimes not possible aboard a vehicle, there is no seizure because the defendant's "freedom of movement" is "restricted by a factor independent of police conduct—*i.e.*, by his being a passenger." *Bostick*, 501 U.S. at 436.

True, the commercial bus setting presented in *Drayton* and *Bostick* has a less coercive atmosphere than a law enforcement vehicle. But that fact is insufficient to establish a seizure. Because *Bostick*'s "free to terminate" inquiry turns on the objective understanding of a reasonable person, the reason *why* the suspect voluntarily entered the vehicle is more significant than the kind of vehicle involved. The defendants in *Drayton* boarded the bus purely for transportation purposes and without the expectation of police questioning; Dates entered the police vehicle and traveled with the agents to McDonald's precisely to have a conversation about his online activities. A reasonable person in Dates's situation, after having entered a vehicle of his own free will to talk to federal

14

agents, would understand that he was similarly free to terminate the conversation and go about his day—which Dates in fact did. *Cf. United States v. Chee*, 514 F.3d 1106, 1114 (10th Cir. 2008) (ruling that "[t]he fact that the interrogation moved from one topic to another [more incriminating] topic that Mr. Chee did not expect" does not establish a custodial interrogation under *Miranda* because, among other things, the suspect freely left the police station).

Considering these circumstances in their totality, we conclude that Dates's encounter with law enforcement was consensual, and that therefore the Fourth Amendment was not implicated.

B.

Dates also seeks suppression on the ground that his statements were given during a non-Mirandized custodial interrogation. Aplt. Br. at 18. Given the coercive nature of a custodial police interrogation, the United States Supreme Court has held that certain warnings must be given to a suspect to protect the Fifth Amendment privilege against self-incrimination. *See Miranda*, 384 U.S. at 444. "It is well established," however, "that 'police officers are not required to administer *Miranda* warnings to everyone whom they question.'" *United States v. Erving L.*, 147 F.3d 1240, 1246 (10th Cir. 1998) (quoting *Mathiason*, 429 U.S. at 495). Rather, *Miranda* warnings are required only when a suspect is in "custody," that is, deprived of "freedom of action . . . to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (quotation marks omitted). Though this analysis considers the "totality of the circumstances," the court "ignore[s] the subjective views of the interrogating officers"

15

and focuses "only on what a reasonable person would have understood from the situation." *See United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007).

Generally speaking, identifying a Fourth Amendment seizure (the analysis we performed above) and a custodial interrogation under *Miranda* are "analytically distinct inquiries." *See id.* at 1273. But if a citizen-police encounter is not a Fourth Amendment seizure because a reasonable person in the suspect's position would feel free to terminate the encounter, then that suspect cannot have been deprived of freedom in a degree akin to a formal arrest. Since we conclude that Dates was not seized, we also conclude he was not subjected to a custodial interrogation.

III.

For the reasons stated above, we affirm the district court's order denying Dates's motion to suppress.

Entered for the Court

Allison H. Eid
Circuit Judge

16