**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 3, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ERIC JOVANO MADRID-MENDOZA,

    Defendant - Appellant.

No. 19-2105
(D.C. No. 1:18-CR-02209-JAP-1)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **MURPHY**, and **MATHESON**, Circuit Judges.
_____

Defendant Eric Madrid-Mendoza entered a conditional plea of guilty to three counts of transporting illegal aliens, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) and (a)(1)(A)(v)(II), and was sentenced to a term of fifteen months' imprisonment. Consistent with the terms of his plea agreement, Madrid-Mendoza appeals from the district court's denial of his motion to suppress evidence. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

I

On the morning of Monday, June 18, 2018, New Mexico State Police Officer Hermilo Lucero was on duty and driving eastbound on I-40 into the city of Albuquerque. Lucero encountered and began driving the same speed as a silver-colored Honda Pilot with California license plates that was also driving eastbound. According to Lucero, his vehicle and the Honda were both traveling approximately seventy miles per hour, which was five miles over the posted speed limit of sixty-five miles per hour. After driving at that speed together for approximately a mile-and-a-half, Lucero initiated a traffic stop on the Honda. The time of the initial stop was 7:59 a.m.

After stopping the Honda, Lucero left his patrol car and approached the passenger-side window of the vehicle. Lucero identified himself and explained that he had stopped the Honda for speeding. He asked the driver for his license, registration, and insurance information. The driver, Luis Alberto Salazar, stated that he did not have a driver's license, and instead had only a Mexican voter identification card. Salazar handed the Mexican voter identification card to Lucero with his right hand, and Lucero noticed that Salazar's left hand was shaking "pretty uncontrollably." R., Vol. 3 at 17.

Defendant Madrid-Mendoza was sitting in the front passenger seat of the Honda, and Lucero observed "several more [men] sitting in the back area of the [vehicle]." *Id.* According to Lucero, the men seated in the back appeared to be between sixteen and nineteen years of age, and were acting "really nervous" and

2

"really scared." *Id.* at 18. Lucero also noticed a significant amount "of body odor emitting from the vehicle." *Id.* In addition, Lucero observed "a lot of luggage sitting in the back cargo area" of the vehicle. *Id.*

Based upon his "training and experience," Lucero suspected that "these young men" in the back of the vehicle might "be either . . . victim[s]" or might "be involved in some type of criminal activity, maybe such as human trafficking." *Id.* at 19. Lucero testified that he had learned from performing numerous traffic stops "of people . . . being smuggled" that they "don't have a lot of time to take care of their human needs such as bathing," and "[t]hey are usually stuck in a vehicle . . . for long periods of time . . . ." *Id.*

After Salazar handed his Mexican voter identification card to Lucero, Lucero asked Salazar to step back to the patrol car and stand by the front passenger tire of the patrol car. Lucero then contacted his supervisor and informed the supervisor that he suspected that the men in the back of the vehicle were being smuggled. Lucero's supervisor told Lucero that he would send over Homeland Security agents to investigate the situation.

Salazar told Lucero that he and the other men in the Honda, who he identified as coworkers, were traveling from California to Amarillo, Texas. Salazar stated that Madrid-Mendoza was the owner of the vehicle and had been driving, but that Madrid-Mendoza had become tired and moved to the front passenger seat.

At approximately 8:06 a.m., Lucero advised Salazar that he was going to give him warning citations. Lucero stated that he needed to check the Honda's VIN

3

number and the federal sticker on the door jamb, and he asked Salazar for permission to open the driver's side door in order to check the federal sticker. Salazar gave Lucero permission. Lucero walked to the Honda, checked the VIN number and federal sticker, and determined that everything matched. While the driver's side door of the Honda was open, Lucero spoke with Madrid-Mendoza, who advised Lucero that he and the other men were traveling to Amarillo to do some construction work for about a month.

Lucero returned to his patrol car at approximately 8:09 a.m. and began preparing warning citations "for speed and no driver's license." *Id.* at 23. A printer problem briefly delayed Lucero in printing the warning citations. While Lucero was printing out the citations, he called his supervisor and a Homeland Security agent to determine when the Homeland Security agents would be arriving on the scene.

At approximately 8:15 a.m., Lucero began reviewing the warning citations with Salazar and obtaining Salazar's signature on the citations. At approximately 8:19 a.m., Lucero returned Salazar's documents to him. Lucero asked Salazar for confirmation that all of his documents had been returned, and Salazar said yes. Lucero advised Salazar that he was free to leave and told him to have a good day. Salazar turned around and began walking back to the Honda. Before Salazar reached the vehicle, however, Lucero called out to him and asked if he could talk to him a little bit. Salazar walked back towards Lucero and Lucero asked Salazar if he could ask him some additional questions. Salazar said yes.

4

In response to questioning from Lucero, Salazar stated that the men in the Honda were on their way to Amarillo to do some construction work on some apartments. Salazar stated that work in California was really slow and that the group would be making a lot more money in Amarillo. Salazar also stated that the company that hired them (Canyon Placeres) was paying for half of their hotel fees, and the men were paying for the other half.

At approximately 8:21 a.m., Lucero told Salazar to stand by the patrol vehicle for a moment. Lucero then walked from his patrol vehicle to the passenger side of the Honda and began talking to Madrid-Mendoza. Lucero first advised Madrid-Mendoza that he was free to leave. Lucero then asked Madrid-Mendoza if he could ask him some questions, and Madrid-Mendoza agreed. Madrid-Mendoza told Lucero that the men in the Honda were driving to Amarillo and were planning to be there for two to three weeks to do some type of concrete construction work. Madrid-Mendoza also told Lucero that the company that had hired them, which he identified as Largo Concrete Company, was paying for all of their room and board. Notably, this was a different company than the one Salazar had identified.

At approximately 8:23 a.m., Lucero returned to and briefly entered his patrol vehicle. At approximately 8:25 a.m., Lucero got out of his patrol vehicle and asked Salazar additional questions. At approximately 8:26 a.m., Lucero again returned to his patrol vehicle.

Homeland Security agents arrived on the scene at approximately 8:27 a.m. and asked the passengers in the Honda for their immigration papers. The passengers

5

responded that they did not have any papers. The Homeland Security agents took all of the occupants of the Honda, including Madrid-Mendoza, into custody.

After being taken into custody, the five passengers who were riding in the back of the Honda were interviewed by Homeland Security agents. Three of those men told the agents that they had paid Madrid-Mendoza to be transported to different states within the United States. One of the men said he paid a third party to be transported to Houston, Texas, and that Madrid-Mendoza had promised him work as a roofer. Another of the passengers similarly stated that Madrid-Mendoza had promised him work as a roofer in Texas. Madrid-Mendoza was interviewed by Homeland Security agents and, after being advised of his Miranda rights, confessed to being paid by a man named Jorge to transport undocumented aliens.

II

On July 10, 2018, a federal grand jury indicted Madrid-Mendoza on three counts of transporting illegal aliens, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) and (a)(1)(A)(v)(II).

Madrid-Mendoza moved to suppress the "the evidence and statements obtained from his arrest on June 18, 2018." R., Vol. 2 at 10. Madrid-Mendoza argued in his motion that "[t]he evidence must be suppressed because it was seized without a warrant after an unreasonable and excessive detention – lacking reasonable suspicion or valid consent – that ultimately yielded evidence of alien smuggling." *Id.* Madrid-Mendoza did not challenge the Homeland Security agents' probable cause to arrest

6

him, but instead argued that any evidence obtained from his arrest should be suppressed as fruit of the illegal detention—a detention of unjustified duration.

The district court held an evidentiary hearing on the motion to suppress. The government presented testimony from Lucero. Madrid-Mendoza presented no evidence.

The district court subsequently issued a memorandum opinion and order denying Madrid-Mendoza's motion to suppress. The district court concluded that the initial traffic stop was reasonable at its inception, and that "Lucero's inquiries leading to issuance of the warning citations were within the scope of a routine traffic stop and did not measurably extend the stop." *Id.*, Vol. 1 at 18. The district court further concluded that "well before the traffic stop concluded, Officer Lucero developed a reasonable and articulable suspicion that alien smuggling was occurring which justified any additional investigative questioning and [Madrid-Mendoza's] continued detention." *Id.* at 23. The district court offered the following reasons in support of its conclusion:

> Officer Lucero testified that, based on his experience, he had reason to believe there was human trafficking occurring as soon as he initiated contact with the occupants of the Honda SUV based on the following factors: (1) I-40 is a major west to east smuggling route; (2) the driver did not have a driver's license but instead produced, with his hand shaking "uncontrollably," a Mexican voter identification card; (3) there were seven people in the vehicle; (4) the occupants in the back of the vehicle appeared "really young," such that Officer Lucero thought they should be in school or with parents; (5) the occupants appeared "nervous," "scared" and had a "deer in headlights look,"; (6) the occupants in the back of the vehicle kept looking forward and not at Officer Lucero; (7) there was a strong body odor in the vehicle; and (8) there was a lot of luggage in the cargo area of the vehicle. Later

7

while asking "clarifying questions," Officer Lucero also discovered inconsistency between Mr. Salazar and Defendant's statements pertaining to the name of the company the men intended to work for in Amarillo, where they intended to stay, and who would pay for their rooms.

* * *

The Court concludes that the totality of the specific articulable facts . . . reasonably prompted Officer Lucero to suspect that Defendant's Honda SUV was transporting undocumented aliens.

*Id.* at 24-26.[1] Consequently, the district court "conclude[d] that the detention did not violate [Madrid-Mendoza's] Fourth Amendment rights," and that, as a result, "the fruit of the poisonous tree doctrine [wa]s inapplicable." *Id.* at 27.

Madrid-Mendoza entered into a written plea agreement pursuant to which he pleaded guilty to all three counts alleged in the indictment. Under the terms of the agreement, Madrid-Mendoza expressly waived his right to appeal or collaterally attack his convictions or sentence, except that he expressly reserved the right to appeal the district court's denial of his motion to suppress.

The district court sentenced Madrid-Mendoza to fifteen months' imprisonment and no period of supervised release.[2] Final judgment was entered in the case on June 27, 2019. Madrid-Mendoza filed a timely notice of appeal.

---

[1] "The [district court] f[ound] . . . unreasonable, and [thus gave] no weight to, Officer Lucero's rationale that the large amount of luggage in the cargo area was consistent with alien smuggling because people being smuggled often carry their whole lives with them. In fact, [the district court noted,] it is often the lack of luggage on a long trip which arouses suspicion." R., Vol. 1 at 24 n.6.

[2] According to Madrid-Mendoza's opening brief, he has completed the term of imprisonment. Aplt. Br. at 12.

III

Madrid-Mendoza argues in his appeal that "[t]he district court reversibly erred in denying [his] motion to suppress because [Lucero] did not have reasonable suspicion to prolong the traffic stop or to detain him after giving written warnings to the driver [Salazar]." Aplt. Br. at 13. According to Madrid-Mendoza, "the facts on which [the district court] relied were so innocuous or of such little probative value that they did not establish reasonable suspicion, either individually or in totality." *Id.* at 14.

"'When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review *de novo* the ultimate determination of reasonableness under the Fourth Amendment.'"[3] *United States v. Sadlowski*, 948

---

[3] In *United States v. Cortez*, 965 F.3d 827, 833 n.4 (10th Cir. 2020), we emphasized that "[t]his represents the standard of review on appeal when the government prevails" and "is not the appropriate standard for the district court to apply in the first instance when hearing a motion to suppress evidence." The district court in this case erroneously applied this standard in assessing the evidence presented by the government at the evidentiary hearing. R., Vol. 1 at 17 ("In deciding a motion to suppress, the Court views the evidence in the light most favorable to the United States."). As we noted in *Cortez*, however, "the inferences" that a "district court draws from" the evidence presented at an evidentiary hearing on a motion to suppress "are entirely within its discretion." 965 F.3d at 833 n.4.

Because the evidence presented by the government at the evidentiary hearing in this case was largely undisputed, we conclude that the district court's factual findings were not clearly erroneous, and that its misapplication of the standard of review does not constitute reversible error.

F.3d 1200, 1203 (10th Cir. 2020) (quoting *United States v. Katoa*, 379 F.3d 1203, 1205 (10th Cir. 2004)).

"A traffic stop must be justified at its inception and, in general, the officer's actions during the stop must be reasonably related in scope to the circumstances that initially justified it." *United States v. Lopez*, 849 F.3d 921, 925 (10th Cir. 2017). "A stop may, however, be extended beyond that scope if the person stopped consents to the extension or if the police have a reasonable suspicion that other illegal activity has occurred or is occurring." *Id.*

For reasonable suspicion to exist, an officer must have a "particularized and objective basis for suspecting" criminal conduct. *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). To assess whether an officer had "particularized and objective" reasonable suspicion, courts consider the "totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotations omitted). The determination of reasonable suspicion "must be based on [an officer's] commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (citing *Cortez*, 449 U.S. at 418). Consequently, "[t]his process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (quotation omitted).

Reasonable suspicion cannot be based on a "mere hunch," but it "need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* at 274 (quotation omitted).

10

"[R]easonable suspicion may exist even if it is more likely than not that the individual is not involved in any illegality." *Mocek v. City of Albuquerque*, 813 F.3d 912, 923 (10th Cir. 2015) (quotations omitted).

Madrid-Mendoza challenges the seven facts that the district court expressly relied on in concluding that Lucero had reasonable suspicion to support extending the stop: (1) the fact that the stop occurred on I-40, which Lucero considered to be a major west-to-east route for smuggling; (2) the fact that Salazar did not have a driver's license and instead produced, with his hand shaking "uncontrollably," a Mexican voter identification card; (3) the fact that there were seven people in the Honda; (4) the fact that the occupants in the back of the Honda appeared to be "really young," such that Lucero thought that they should be in school or with parents at the time of the stop; (5) the fact that the occupants of the Honda appeared "nervous," "scared," and had a "deer in the headlights look"; (6) the fact that the occupants in the back of the Honda kept looking forward and not at Lucero; and (7) the strong smell of body odor that emanated from the Honda. Lucero argues that these factors "were either entirely innocuous or of exceedingly little weight in suggesting that the men [in the Honda] were engaged in criminal activity." Aplt. Br. at 3.

As an initial matter, we conclude that the mode of analysis suggested by Madrid-Mendoza in his opening appellate brief—separately analyzing each factor and then discarding it—is contrary to the approach mandated by the Supreme Court. Specifically, Madrid-Mendoza's repeated reliance on *United States v. Wood*, 106 F.3d 942, 946–948 (10th Cir. 1997) and its "evaluation and rejection of . . . the listed

11

factors in isolation from each other does not take into account the 'totality of the circumstances,'" as is required by Supreme Court precedent. *Arvizu*, 534 U.S. at 274. The Supreme Court has repeatedly held that even if a series of acts are "perhaps innocent in [themselves]," they can nevertheless, when considered together, provide reasonable suspicion to justify further investigation. *Id.* Therefore, although we shall proceed to discuss the facts cited by Madrid-Mendoza, we will consider them in chronological order, taking into account the point at which, if at all, an objective officer in Lucero's position could have developed a reasonable suspicion of illegal activity.

When Lucero first approached the Honda, the only fact that might have suggested illegal activity was that, in his experience, I-40 was a major west-to-east route for smuggling aliens. That fact standing alone, however, was not enough to provide reasonable suspicion, particularly since I-40 is a major interstate highway used by many people not engaged in illegal activity. *Cf. United States v. $252,300.00 in U.S. Currency*, 484 F.3d 1271, 1274 n.3 (10th Cir. 2007) ("So many locales have been labeled 'known drug sources' by law enforcement that it appears nearly any trip down the interstate would place one en route to or from an alleged drug source."). Thus, this fact alone could not have provided an objective officer in Lucero's position with reasonable suspicion that the occupants of the Honda were engaged in criminal conduct.

When Lucero approached the Honda and asked to see Salazar's driver's license, Salazar responded that he had no driver's license, and instead handed Lucero

12

a Mexican voter identification card. Lucero observed that Salazar's hand was shaking "uncontrollably" as he handed the identification card to Lucero. Although each of these facts (lack of driver's license, Mexican citizenship, and nervousness) alone can be consistent with innocent conduct, we conclude that together these facts provided some indication that the men in the Honda might be engaged in criminal activity. *Cf. Vasquez v. Lewis*, 834 F.3d 1132, 1138 (10th Cir. 2016) (holding that "nervousness is of limited significance in determining reasonable suspicion"); *United States v. Garcia*, 23 F.3d 1331, 1335 (8th Cir. 1994) ("The fact that Garcia was carrying a Mexican identification card does not implicate him in illegal activity."). That said, we likewise conclude that the accumulated facts available to Lucero at that point in the stop remained insufficient to give rise to a reasonable suspicion of illegal activity.

While Lucero was speaking with Salazar and obtaining his identification card and papers, he observed five men seated in the back of the vehicle, all of whom appeared to Lucero to be "really young," "really nervous," and "really scared."[4] R., Vol. 3 at 18. Lucero testified that the men appeared to be young enough that he thought they would normally still be living with their parents and attending school. Lucero also noticed "a really bad odor of – foul odor of body odor emitting from the

---

[4] Madrid-Mendoza, in his opening brief, argues that "[a]lthough [Lucero] testified the passengers were 'nervous' and 'scared,' the [dash cam] video of his interaction with them does not corroborate his claim." Aplt. Br. at 29. Notably, however, Madrid-Mendoza does not argue that the district court's finding that the passengers were nervous and scared was clearly erroneous.

vehicle." *Id.* Lucero testified that the odor suggested that the group had been traveling for some time without bathing.[5] Lucero also testified that, based upon his "training and experience," he suspected that the young men in the back of the Honda could be "victim[s]" or might "be involved in some type of criminal activity . . . such as human trafficking" or alien smuggling. *Id.* at 19.

We conclude that all of the information gathered by Lucero at this point in the stop, considered together, was sufficient to give rise to a reasonable suspicion that the men in the Honda were engaged in some type of criminal activity, such as alien smuggling. And, at that point, the stop had been underway for only minutes. That information included Lucero's observations of the young men in the back of the Honda and their nervous behavior, the strong body odor emanating from the vehicle, the reasonable inference that the group had been traveling in the vehicle for an extended period of time, and the fact that the vehicle was being driven by a Mexican citizen with no driver's license, on an interstate highway that Lucero's previous law enforcement experience taught him was a major route for alien smuggling. We therefore conclude that any continued detention beyond that point was supported by reasonable suspicion, and that Lucero did not violate Madrid-Mendoza's Fourth Amendment rights.

---

[5] The notion that the group had been traveling for an extended period of time without stopping was bolstered by Salazar's statement to Lucero that he was driving only because Madrid-Mendoza had become too tired to do so.

IV

We AFFIRM the district court's denial of Madrid-Mendoza's motion to suppress evidence.


Entered for the Court


Mary Beck Briscoe
Circuit Judge