**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2312
_____

COREY FALLEN

v.

THOMAS MCENROE, in his individual capacity; JOSEPH HADLEY; CITY OF
NEWARK; CHIEF SHEILLAH COLEY; DIRECTOR SAMUEL DEMAIO;
SUPERINTENDENT JOSEPH FUENTES; NEW JERSEY STATE POLICE

JOSEPH HADLEY,
Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2:15-cv-02286)
District Judge: Honorable Evelyn Padin
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
October 28, 2024

Before: HARDIMAN, PHIPPS, and FREEMAN, *Circuit Judges*.

(Filed: January 6, 2025)

_____

OPINION*
_____

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

HARDIMAN, *Circuit Judge*.

Detective Joseph Hadley appeals the District Court's order denying his motion for summary judgment on civil rights claims arising from Corey Fallen's arrest, detention, and prosecution. Hadley claims we have jurisdiction because his appeal raises only questions of law about qualified immunity. Fallen argues that disputed issues of material fact exist. Because we agree with Fallen, we will dismiss the appeal for lack of jurisdiction.

I

On January 25, 2012, Denise Ramsey's body was found in an empty lot in East Orange, New Jersey. Thomas McEnroe, a Detective with the New Jersey State Police, led the investigation into her death. Hadley, a Detective with the Essex County Prosecutor's Office Homicide Task Force, participated in the investigation to a lesser degree.

Ramsey was a dancer who was last seen with two African American men at her workplace, the Doll House, in early December 2011. On January 26, 2012, McEnroe interviewed the Doll House's general manager, Gary Capone, Jr. Capone described one of the men as about five feet, eight inches tall and said that he had dark skin and gloated about recently beating a murder charge. Capone described the other man as about six feet tall.

The next week, McEnroe interviewed Erica Hamilton, another dancer at the Doll House. According to her, the men said they were from Atlanta, Georgia, and they identified themselves as "Joe" and "Big Red." "Joe" was dark-skinned and about five

feet, ten inches tall, and "Big Red" was light-skinned and about six feet tall. Hamilton said that "Big Red" bragged about recently beating a murder charge. McEnroe also spoke with Jasmine Jones, another dancer, and she gave McEnroe "Joe's" cellphone number. After obtaining a warrant for records associated with that cellphone, McEnroe suspected that John Jones was "Joe."

That same day, McEnroe obtained photographs of two individuals recently acquitted of murder in Atlanta. One of these photographs was of Fallen, a light-skinned African American male who is only five feet, five inches tall.

In June—nearly six months after the homicide—McEnroe interviewed Capone again. A detective showed Capone two photo arrays with six individuals each. From the first photo array, Capone identified Fallen as the man who gloated about beating a murder charge. From the second photo array, Capone identified John Jones. As to Fallen, Capone said, "I do need to mention at the time his hair was not like that." Dist. Ct. Dkt. ECF No. 169-19 at 25.

In August, now eight months after the homicide, Hadley presented two photo arrays with six individuals each to Jasmine Jones for identification. She identified Fallen, but when Hadley asked whether he was at the Doll House the night of the murder, she twice said, "I don't know." App. 217–18.

Though Fallen was at least six inches shorter than "Big Red," McEnroe and Hadley pursued Fallen as a suspect. They traveled to Georgia in September to collect DNA samples from Fallen and John Jones. In October, the test results identified John

3

Jones as a contributor to two DNA profiles obtained from Ramsey but excluded Fallen as a possible contributor.

After obtaining the test results, McEnroe applied for arrest warrants for Fallen and John Jones. In his affidavit, McEnroe said that two witnesses had identified John Jones and Fallen, but he omitted that these identifications had occurred over six months after the murder and that Jasmine Jones twice expressed uncertainty. McEnroe also mentioned the DNA test results for John Jones—but not Fallen—and the judge issued the warrants. McEnroe and Hadley traveled from New Jersey to Georgia to execute the warrants.

On October 24, McEnroe and Hadley went to John Jones's residence, but he was not there. Brian Love was inside, and he said that he had not seen John Jones for two weeks. The officers arrested Love on marijuana charges, and the parties dispute whether Love implicated himself in Ramsey's murder at that time. This factual dispute arises from an interrogatory in which Fallen asked how Hadley "became aware that Brian Love was the second individual who was seen with Ms. Ramsey on the night she disappeared and when was the first time [Hadley] became aware of his involvement in her murder." Dist. Ct. Dkt. ECF No. 169-35 at 21. Hadley responded that he "became aware of this information when Mr. Love gave a statement in Georgia on October 24, 2012 indicating his involvement in the murder of Ms. Ramsey." *Id.* That interrogatory answer conflicted with McEnroe's report, which states that Love confessed in 2014.

The day after Love was arrested, Fallen turned himself in. Fallen remained in custody for nearly six months until Hadley and McEnroe finally investigated his alibi.

4

II[1]

Hadley claims that we have jurisdiction over his interlocutory appeal from the denial of qualified immunity because "it turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). He argues that his conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Andrews v. Scuilli*, 853 F.3d 690, 697 (3d Cir. 2017) (cleaned up). But as the District Court held, Fallen's right to be free from arrest, detention, and prosecution without probable cause was clearly established decades before his arrest.[2] Because the officers obtained an arrest warrant, Hadley would ordinarily be entitled to qualified immunity unless "the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood in applying for a warrant" and "such statements or omissions [were] material, or necessary, to the finding of probable cause." *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997).

Hadley contends that the affidavit's omissions were immaterial because the two identifications of Fallen established probable cause. He analogizes this case to *Wilson v. Russo*, where we held that an officer's omission about an approximately six-inch height

---

[1] The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367.

[2] We also conclude that the District Court framed the relevant constitutional rights at the appropriate level of specificity. *See Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995) (arrest); *Groman v. Twp. of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995) (detention); *Gallo v. City of Philadelphia*, 161 F.3d 217, 220 n.4 (3d Cir. 1998) (prosecution); *see also Pinkney v. Meadville, Pennsylvania*, 95 F.4th 743, 749–50 (3d Cir. 2024).

5

difference was immaterial because a witness had identified the plaintiff as the perpetrator. 212 F.3d 781, 791–92 (3d Cir. 2000). We explained that a "positive identification by a victim witness, without more, would usually be sufficient to establish probable cause." *Id.* at 790.

But when the facts are viewed in the light most favorable to Fallen, the officers knew of "[i]ndependent exculpatory evidence," "substantial evidence of the [witnesses'] own unreliability," and a confession that undermined probable cause.[3] *Id.* Capone and Jasmine Jones identified Fallen over six months after the homicide. When identifying Fallen, Capone said, "I do need to mention at the time his hair was not like that." Dist. Ct. Dkt. ECF No. 169-19 at 25. And when Hadley asked Jasmine Jones whether Fallen was at the Doll House the night of the murder, she twice said, "I don't know." App. 217–18. Not only did the officers know that Fallen was about six inches shorter than the suspect, they also knew that the DNA test results excluded Fallen as a possible contributor. As we explained in *Wilson*, "an otherwise credible victim identification would not provide probable cause if police officers contemporaneously possessed reliable DNA evidence which determined conclusively that the accused could not have committed the crime." 212 F.3d at 790. Yet the affidavit omitted the DNA test results and alleged that Fallen was with John Jones and Ramsey the night that she was murdered. So our dissenting

---

[3] Hadley claims that his limited involvement in the investigation entitles him to qualified immunity. We disagree. A reasonable jury could find otherwise because Hadley went with McEnroe to Georgia to collect Fallen's DNA and again to execute the arrest warrant.

colleague's abstract suggestion about a hypothetical case—in which conspiracy to commit murder requires neither physical contact nor a murder—has nothing to do with *this* case.

Even worse, taking the facts as we must at this stage in the light most favorable to Fallen, Hadley knew that *Love admitted* he was the second perpetrator before Fallen was taken into custody for six months. The District Court's denial of qualified immunity rested, in part, on the fact that "if Love confessed, on October 24, 2012, then McEnroe and Hadley would have learned that the second suspect, 'Big Red,' was Love, not [Fallen], one day before" Fallen's arrest. *Fallen v. City of Newark*, 2023 WL 4118142, at *20 (D.N.J. June 22, 2023). In response to that conclusion, Hadley argues only that this factual dispute about Love resulted from a "clerical error" in one of his interrogatory answers. Hadley Br. 19. But at this stage of the proceedings, we cannot accept at face value Hadley's suggestion that we disregard his interrogatory response.[4] So a factfinder will have to determine when Hadley learned of Love's involvement in the murder. *See Johnson v. Jones*, 515 U.S. 304, 313 (1995).

In sum, when the facts are viewed in the light most favorable to Fallen, Hadley would not be entitled to qualified immunity because "an apparently valid warrant does not render an officer immune from suit if his reliance on it is unreasonable in light of the relevant circumstances." *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 273 (3d Cir. 2000)

---

[4] Besides, Hadley testified in his deposition that Love made a statement related to the murder of Ramsey on October 24, 2012, although he could not recall what Love specifically said.

7

(per curiam) (explaining that such "circumstances include, but are not limited to, other information that the officer possesses or to which he has reasonable access"). For that reason, in *Berg*, we concluded that information learned by an arresting officer while executing a warrant was relevant and required additional factfinding by the district court before we could address qualified immunity. *See id.* (acknowledging that "Berg's cooperativeness, the fact that Berg had a driver's license despite allegedly being on parole for DUI, [and] the fact that Berg did not flee or ask his guests to leave" created "valid questions concerning the reasonableness of" the arresting officer's conduct). So too here. If Love confessed before Fallen was taken into custody, no reasonable officer could have relied on the arrest warrant at that point and Hadley would not be entitled to qualified immunity.

Hadley did not respond to Fallen's contention that the disputed timing of Love's confession precludes summary judgment. Normally, that failure would doom Hadley's appeal. But our dissenting colleague takes the baton from Hadley's counsel and fashions a lawyerly argument that Hadley could have made. He proffers that the timing of Love's confession is immaterial because it occurred after the officers had acquired the arrest warrant.

We disagree with the notion that Love's confession—and Fallen's exoneration—would have been immaterial. (It's hard to imagine how actual innocence could ever be immaterial to a criminal case). But that is beside the point because, as noted, Hadley never made that argument in the District Court or this Court. And that failure is fatal to

8

Hadley's appeal because our precedent precludes us from reversing the District Court based on a forfeited argument. *See United States v. Joseph*, 730 F.3d 336, 337 (3d Cir. 2013) ("We hold that for parties to preserve an argument for appeal, they must have raised the same *argument* in the District Court—merely raising an *issue* that encompasses the appellate argument is not enough."); *United States v. Dupree*, 617 F.3d 724, 728 (3d Cir. 2010) (explaining that "courts rely on the litigants not only to cite relevant precedents, but also to frame the issues for decision").

The dissent responds at the highest level of generality by noting that "the clearly established prong of the qualified immunity analysis" was "raised and argued in the District Court and here." Dissent at n.5. But that truism disregards *Joseph*, where we explained that "raising an issue is not sufficient to preserve all arguments within the issue." 730 F.3d at 341. And because Hadley said nothing about the materiality of Love's confession in the District Court or this Court, he forfeited that argument. The dissent's reliance on *Dempsey v. Bucknell University*, 834 F.3d 457 (3d Cir. 2016)—a case Hadley never cited—proves the point.

III

For the reasons stated, we will dismiss the appeal for lack of jurisdiction.

*Fallen v. McEnroe*, No. 23-2312
PHIPPS, *Circuit Judge*, dissenting.

Although Corey Fallen was arrested and detained for a crime he did not commit, qualified immunity precludes his claim against Detective Joseph Hadley for false arrest in violation of the Fourth Amendment. Even if the exculpatory information omitted from the arrest warrant affidavit had been included, there would still have been probable cause for the charge of conspiracy to commit murder, and so the omitted information was immaterial. Furthermore, even assuming that the officers learned of additional exculpatory evidence after the warrant issued but before its execution, an arrest of Fallen under those circumstances would not be a clearly established Fourth Amendment violation. For these reasons, as elaborated below, I respectfully dissent.

## 1. The Omitted Exculpatory Information Was Not Material.

Ordinarily, a valid arrest warrant issued by an impartial magistrate confers qualified immunity on an arresting officer for claims of unlawful arrest. *See Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). Under one of the two recognized exceptions to that general rule, referred to as the '*Franks* exception,' an affidavit containing a "deliberate falsehood or reckless disregard for the truth," strips a law enforcement officer of the immunity provided by the warrant. *Franks v. Delaware*, 438 U.S. 154, 171 (1978) (justifying the exception on the grounds that such an affidavit deprives the magistrate the opportunity to exercise his or her independent judgment).[1] In construing the *Franks* exception, this Court has interpreted the term 'reckless disregard for the truth' to include the knowing or reckless omission of material exculpatory information. *See Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997) (citing *Franks*,

---

[1] The other recognized exception applies to a warrant supported by only a 'bare-bones' affidavit. *See United States v. Leon*, 468 U.S. 897, 920 (1984); *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986).

438 U.S. at 171–72). On appeal, Fallen argues that the affidavit in support of the warrant for his arrest satisfied the *Franks* exception because it excluded three pieces of material exculpatory information: (i) the results of a DNA test that did not find a match between Fallen's DNA and two profiles collected from the murder victim, Denise Ramsey; (ii) an eyewitness's expression of uncertainty after selecting Fallen from a photo array; and (iii) eyewitness accounts that described the relevant suspect as tall and six-to-seven inches taller than Fallen.[2]

I do not dispute that the omitted information was exculpatory to some degree. The lack of a DNA match between Fallen and Ramsey suggests that he did not have physical contact with her. Similarly, the statement of uncertainty by one of the eyewitnesses who identified Fallen from a photo array made that identification less reliable. And as to the height disparity, Fallen is five-foot-five, and so the eyewitness accounts that the relevant suspect was about six-feet tall made it less likely that Fallen was the co-conspirator.

Although the omitted information was exculpatory, I do not view any of it – either individually or cumulatively – as material. *See Maryland v. Pringle*, 540 U.S. 366, 372 n.2 (2003) (explaining probable cause must be considered in the "totality of the circumstances," not "in isolation"). Evaluating the materiality of omitted exculpatory information involves reconstructing the record before the judge who issued the warrant by including the omitted information. *See Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000) (describing the undertaking as "the reconstructive surgery required by our jurisprudence"). If, on that reconstructed record, there still would have been probable

---

[2] In District Court, Fallen complained of other omissions from the arrest warrant affidavit – his assertion that he had never been to New Jersey and evidence of a third possible suspect. But the District Court ruled that those pieces of information were immaterial and did not have to be included in the warrant affidavit. Fallen does not challenge those rulings on appeal.

cause, then the omitted information was immaterial. *See Sherwood*, 113 F.3d at 402 (explaining that without the affirmatively false statements in the warrant application, there still would have been probable cause for a search, and thus the *Franks* exception did not provide a basis for defeating qualified immunity). Following that process here, the issue becomes whether there would have been probable cause for Fallen's arrest if the exculpatory information had been included in the warrant application.

Probable cause for an arrest requires only "particularized suspicion" or "practical, nontechnical probability" of guilt for an identified offense, not more-likely-than-not evidence that the specific crime had been committed. *Texas v. Brown*, 460 U.S. 730, 742 (1983) (internal citation removed); *see also Sherwood*, 113 F.3d at 401. As a baseline, the information in the original warrant affidavit, if it were the full story, would satisfy the probable-cause standard for arresting Fallen for the crime of conspiracy to commit murder. According to an eyewitness, the suspects were two African-American men from Atlanta, one of whom was "gloating that he . . . just beat a murder charge." Statement of Gary Capone Tr. 9:16–17 (S.A. 31). Fallen, an African-American man, was one of two people who had recently been acquitted of murder in Atlanta. The other possibility, Corey Davis, was immediately excluded from suspicion because court records placed him in Georgia at the time of Ramsey's death in New Jersey, leaving Fallen as the only recent acquittal without an apparent alibi. Later, two eyewitnesses independently identified Fallen from a photo array and accused him of arguing with Ramsey over money, threatening to kill her, and then leaving the club with her and Johnny Jones, the confirmed killer. After checking for DNA from Fallen and Jones on the victim, the test results positively placed Jones there, but not Fallen. Thus, Hadley and the other detectives had reason to believe that the prior information was generally reliable – it led

to a positive identification of Jones, the actual killer – and based on the information in the affidavit that was submitted, there was probable cause that Fallen conspired with Jones to kill Ramsey.

Even on a reconstructed record that included the exculpatory information, there would still have been probable cause to arrest Fallen for conspiracy to commit murder. The DNA test results do not negate probable cause. Fallen was arrested for conspiracy to commit murder, *see* N.J. Stat. § 2C:5-2, and under New Jersey law, conspiracy to commit murder does not require physical contact with the victim or even that a murder takes place at all. *See State v. Cagno*, 49 A.3d 388, 408 (N.J. 2012) ("[When] engaged in a conspiracy . . . defendant would have been guilty of murder even if he had not been present at the scene.") (internal citation omitted); *State v. Chevencek*, 23 A.2d 176, 177 (N.J. 1941) ("[C]onspiracy to commit a crime is an offense, separate and distinct from the crime that has been planned . . . ."). And so, the lack of a DNA match is not material to the conspiracy charge: even without such a match, the reconstructed record still would support a fair probability that Fallen conspired to commit murder. *Cf. Reedy v. Evanson*, 615 F.3d 197, 222 (3d Cir. 2010) (explaining DNA test results indicating that a third-party committed a crime was material to the charge that the arrestee staged the crime and falsified the police report).

Similarly, a statement of uncertainty by one of the two eyewitnesses who identified Fallen from the photo array would not defeat probable cause. That eyewitness still identified Fallen when Hadley, who was not previously involved in the investigation, presented her with a photo array of six African-American men. Despite her stated uncertainty, the officers viewed her as credible because her co-worker independently

identified Fallen as well, and she correctly identified Jones, the actual culprit, at the same time.

The seven-inch disparity between the eyewitness accounts and Fallen's actual height is the most relevant piece of omitted exculpatory evidence. But investigations commonly reveal conflicting evidence, and the probable-cause standard does not demand an indisputably correct resolution of every conflict before a warrant may issue. *See Wright v. City of Philadelphia*, 409 F.3d 595, 603 (3d Cir. 2005) ("[Probable cause] does not require that officers correctly resolve conflicting evidence or that their determinations of credibility, were, in retrospect, accurate."). On similar facts, this Court held that a seven-inch height disparity, in addition to two pieces of less persuasive exculpatory evidence, did not negate a finding of probable cause. *See Wilson v. Russo*, 212 F.3d 781, 791–92 (3d Cir. 2000). Applying that precedent here, the seven-inch height disparity in addition to two pieces of less persuasive exculpatory evidence – the lack of a DNA match relative to a charge of conspiracy to commit murder and one eyewitness's expression of uncertainty as to her positive photo identification of Fallen – would not negate probable cause.

Because probable cause would have existed on a reconstructed record, the *Franks* exception is not met, and without a violation of a federal right, Hadley is entitled to qualified immunity at summary judgment. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *see also Dempsey v. Bucknell Univ.*, 834 F.3d 457, 472–73 (3d Cir. 2016).

## 2. It Was Not Clearly Established that the Omitted Exculpatory Information Was Material.

Qualified immunity protects more than just constitutional actions by law enforcement officers; it also extends to unconstitutional conduct that has not been clearly established as such. *See Pearson*, 555 U.S. at 236. So even if Hadley violated Fallen's

5

Fourth Amendment rights by arresting him, Hadley would receive qualified immunity as long as the violation was not clearly established. To be clearly established, a right must have been previously articulated at a level of specificity that would provide certainty to any reasonable officer that his or her prospective conduct would violate that right. *See City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019) ("[T]he clearly established right must be defined with specificity."); *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) ("To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent."). But at the time of Fallen's arrest, it was not clearly established in either controlling precedent or through a robust consensus of persuasive authority that Hadley would have lacked probable cause on a reconstructed record. *See James v. N.J. State Police*, 957 F.3d 165, 170 (3d Cir. 2020) ("For qualified-immunity purposes, 'clearly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a 'robust consensus of cases of persuasive authority in the Courts of Appeals.'" (quoting *Bland v. City of Newark*, 900 F.3d 77, 84 (3d Cir. 2018))). No then-existing precedent supports the proposition that a seven-inch height differential coupled with two other pieces of less persuasive exculpatory evidence defeats an otherwise strong showing of probable cause for an arrest warrant. Rather, *Wilson v. Russo* held the opposite, *viz.*, that a seven-inch height differential coupled with two other pieces of less persuasive exculpatory information could not overcome a showing of probable cause. *See Wilson*, 212 F.3d at 792. Based on that holding, a reasonable officer could not be fairly on notice that the information omitted from the warrant affidavit was material. *See Kisela v. Hughes*, 584 U.S. 100, 105 (2018) ("[O]fficers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue . . . and thereby provide[s] an officer notice . . . ."

6

(quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015))).  Hence, any Fourth Amendment violation associated with the omission of information from the warrant affidavit was not clearly established.

To reach its outcome – a dismissal for lack of appellate jurisdiction – the Majority Opinion relies on a dispute about facts that arose after the officers applied for a warrant to arrest Fallen and Jones.  The officers submitted that application on October 22, 2012, and the Superior Court in Essex County, New Jersey, issued the warrant later that day.  Then, on October 24, 2012, Hadley and other officers attempted to execute the warrant in Georgia, but when they went to Jones's house, they encountered Love instead, and they arrested him for possession of marijuana.  The parties dispute whether at the time of his arrest, Love confessed to being involved in the Ramsey murder.  But they agree that about two hours later, the officers attempted to arrest Fallen, and although he was not home, he turned himself in the next day.  And in 2014, Love confessed to his involvement in Ramsey's murder.

The Majority Opinion hinges on the materiality of the factual dispute over whether Love confessed to his involvement in Ramsey's murder before Fallen's arrest.  If Love did confess before Fallen was arrested, then the Majority Opinion believes that qualified immunity would not apply.  But if Love did not confess until after Fallen was arrested, then according to the Majority Opinion, Hadley would merit qualified immunity.  Thus, according to the Majority Opinion, that factual dispute prevents the resolution of the qualified immunity issue at summary judgment, leaving the District Court's ruling as a non-final decision.  *Cf.* 28 U.S.C. § 1291 (conferring appellate jurisdiction over final decisions).

7

But when a party would otherwise be entitled to judgment as a matter of law, only genuine disputes of material fact foreclose summary judgment. *See* Fed. R. Civ. P. 56(a). And here, assuming *arguendo* that the factual dispute was genuine, it was not material. Even if Love had confessed to murdering Ramsey two hours before the officers attempted to arrest Fallen, that new information would not have triggered the *Franks* exception. As this Court has explained, such after-acquired information is irrelevant to the probable cause determination:

> We emphasize that in making the determination about the existence of probable cause, we examine only the information available to the officer at the time of the swearing of the affidavit of probable cause. After-acquired evidence, however significant for trial, does not inform an officer's knowledge or good faith as is relevant for our inquiry today.

*Dempsey*, 834 F.3d at 480.

And because new information falls outside the *Franks* exception, it does not invalidate the qualified immunity conferred by the arrest warrant.

By contrast, the Majority Opinion impliedly endorses a constitutional duty to supplement a warrant affidavit upon learning of material exculpatory information. The Second Circuit has taken such an approach. *See United States v. Marin-Buitrago*, 734 F.2d 889, 893 (2d Cir. 1984) (characterizing the duty as one on officers, who "after a warrant is issued but before it is executed, have an obligation to bring to the attention of the issuing magistrate any new or corrective information that reasonably would have affected the magistrate's initial decision to issue the warrant," and adding that a "[f]ailure to apprise the magistrate of such information would result in the invalidation of the warrant"). But other Circuits have not followed that lead. *See, e.g.*, *Safar v. Tingle*, 859 F.3d 241, 247 (4th Cir. 2017) ("[W]e are unaware of a nebulous duty requiring police officers to follow some undefined procedure whenever they come across further

8

information that casts doubt on an active arrest warrant."); *Peet v. City of Detroit*, 502 F.3d 557, 565 (6th Cir. 2007) (finding no "rationale from cases or other authority that would warrant a court-imposed requirement on police to release suspects the moment sufficiently exculpatory evidence emerges"). And, as explained above, this Court has taken a very different approach than the one taken by the Second Circuit. *See Dempsey*, 834 F.3d at 480.[3]

So, even if Hadley did learn of Love's confession before Fallen's arrest, this Court's precedent does not clearly establish that such a development would trigger the *Franks* exception and defeat qualified immunity for a false arrest claim.[4] Indeed, at least one district judge has interpreted this Court's precedent as not imposing a duty to supplement a warrant affidavit with newly learned exculpatory information. *See Maybin v. Slobodian*, 2017 WL 4310251, at *6 (E.D. Pa. Sept. 28, 2017) ("Once an affidavit is sworn, however, officers do not have a duty to present new exculpatory facts. In *Dempsey*, the Third Circuit laid down a bright-line rule that statements received after an affidavit for probable cause is sworn cannot be considered when reconstructing an affidavit." (citations omitted)). Critically, the fact that a district judge construed this Court's precedent as allowing an officer to execute an arrest warrant after receiving new exculpatory information, strongly suggests that any constitutional violation by Hadley for doing so was not clearly established. So even if the factual dispute is resolved such that

---

[3] *Dempsey*, decided in 2016, post-dates Fallen's 2012 arrest, but as the circuit split on this issue makes clear, even before this Court had controlling precedent on point, there was not a robust consensus of persuasive authority that the *Franks* exception could be satisfied by after-acquired exculpatory evidence.

[4] The lack of clearly established law is even more pronounced upon consideration of the embedded choice-of-law issue. Since the relevant events – the arrest and the disputed confession – occurred in Georgia and in partnership with Georgia sheriffs, it is not clearly established whether the precedent of this Court or that of Eleventh Circuit supplies the controlling substantive legal standard.

9

Love confessed before Hadley attempted to arrest Fallen, Hadley would still merit qualified immunity.[5]  Altogether, without clearly established precedent from this Court that an otherwise valid arrest warrant loses its legitimacy upon an officer's later acquisition of material exculpatory information, Hadley merits qualified immunity.

\* \* \*

For these reasons, I would reverse the denial of qualified immunity to Detective Joseph Hadley.

---

[5] To avoid any misunderstanding, it is the clearly established prong of the qualified immunity analysis, which was raised and argued in the District Court and here, that is the basis for my vote to vacate and remand: if Love confessed for the first time in 2014, then there is no clearly established Fourth Amendment violation for arresting Fallen in 2012; and even if Love confessed for the first time in October 2012, although it might have been a Fourth Amendment violation to subsequently arrest Fallen, it was not clearly established as such at that time by precedent.  Thus, by operation of the 'clearly established' prong of qualified immunity, there is no factual dispute in need of resolution that prevents the exercise of appellate jurisdiction pursuant to the collateral order doctrine, and Hadley is entitled qualified immunity.  *See Mitchell v. Forsyth*, 472 U.S. 511, 528–29 (1985).